CALIFORNIA *v.* TROMBETTA ET AL.

No. 83–305.   Argued April 18, 1984—Decided June 11, 1984

*Charles R. B. Kirk*, Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van De Kamp*, Attorney General, *William D. Stein*, Assistant Attorney General, and *Gloria F. De Hart*, Deputy Attorney General.

*John F. DeMeo* argued the cause for respondents. With him on the brief were *Thomas R. Kenney*, *J. Frederick Haley*, and *John A. Pettis*.*

JUSTICE MARSHALL delivered the opinion of the Court.

The Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment. *United States* v. *Agurs*, 427 U. S. 97 (1976); *Brady* v.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Minnesota et al. by *Hubert H. Humphrey III*, Attorney General of Minnesota, *James B. Early*, Special Assistant Attorney General, and *Thomas L. Fabel*, Deputy Attorney General, *Jim Smith*, Attorney General of Florida, *Linley E. Pearson*, Attorney General of Indiana, *Edwin Lloyd Tittman*, Attorney General of Mississippi, and *Mike Greely*, Attorney General of Montana; for the Appellate Committee of the California District Attorney's Association by *John R. Vance, Jr.*; and for the National District Attorneys Association, Inc., et al. by *David Crump*, *Wayne W. Schmidt*, *James P. Manak*, and *Edwin L. Miller, Jr.*

*George L. Schraer* and *Lisa Short* filed a brief for the State Public Defender of California as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the State of North Carolina by *Rufus L. Edmisten*, Attorney General, and *Isaac T. Avery III*, Special Deputy Attorney General; for the County of Los Angeles by *Robert H. Philibosian*, *Harry B. Sondheim*, and *John W. Messer*; and for the California Public Defender's Association et al. by *Albert J. Menaster*, *William M. Thornbury*, and *Ephraim Margolin*.

*Maryland*, 373 U. S. 83 (1963). This case raises the question whether the Fourteenth Amendment also demands that the State preserve potentially exculpatory evidence on behalf of defendants. In particular, the question presented is whether the Due Process Clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers in order for the results of breath-analysis tests to be admissible in criminal prosecutions.

## I

The Omicron Intoxilyzer (Intoxilyzer) is a device used in California to measure the concentration of alcohol in the blood of motorists suspected of driving while under the influence of intoxicating liquor.[1] The Intoxilyzer analyzes the suspect's breath. To operate the device, law enforcement officers follow these procedures:

> "Prior to any test, the device is purged by pumping clean air through it until readings of 0.00 are obtained. The breath test requires a sample of 'alveolar' (deep lung) air; to assure that such a sample is obtained, the subject is required to blow air into the intoxilyzer at a constant pressure for a period of several seconds. A breath sample is captured in the intoxilyzer's chamber and infrared light is used to sense the alcohol level. Two samples are taken, and the result of each is indicated on a printout card. The two tests must register within 0.02 of each other in order to be admissible in court. After each test, the chamber is purged with clean air and then

---

[1] Law enforcement agencies in California are obliged to use breath-analysis equipment that has been approved by the State's Department of Health. See 17 Cal. Admin. Code § 1221 (1976). The Department has approved a number of blood-alcohol testing devices employing a variety of technologies, see List of Instruments and Related Accessories Approved for Breath Alcohol Analysis (Dec. 20, 1979), reprinted in App. 238–247, of which the Omicron Intoxilyzer is the most popular model, see Brief for Petitioner 6, n. 6.

checked for a reading of zero alcohol. The machine is calibrated weekly, and the calibration results, as well as a portion of the calibration samples, are available to the defendant." 142 Cal. App. 3d 138, 141–142, 190 Cal. Rptr. 319, 321 (1983) (citations omitted).

In unrelated incidents in 1980 and 1981, each of the respondents in this case was stopped on suspicion of drunken driving on California highways. Each respondent submitted to an Intoxilyzer test.[2] Each respondent registered a blood-alcohol concentration substantially higher than 0.10 percent. Under California law at that time, drivers with higher than 0.10 percent blood-alcohol concentrations were presumed to be intoxicated. Cal. Veh. Code Ann. § 23126(a)(3) (West 1971) (amended 1981). Respondents were all charged with driving while intoxicated in violation of Cal. Veh. Code Ann. § 23102 (West 1971) (amended 1981).

Prior to trial in Municipal Court, each respondent filed a motion to suppress the Intoxilyzer test results on the ground that the arresting officers had failed to preserve samples of respondents' breath. Although preservation of breath samples is technically feasible,[3] California law enforcement offi-

---

[2] Under California law, drunken driving suspects are given the choice of having their blood-alcohol concentraton determined by either a blood test, a urine test, or a breath test. Cal. Veh. Code Ann. § 13353 (West 1971 and Supp. 1984). Suspects who refuse to submit to any test are liable to have their driving licenses suspended. *Ibid.*

[3] The California Department of Health has approved a device, known as an Intoximeter Field Crimper-Indium Tube Encapsulation Kit (Kit), which officers can use to preserve breath samples. App. 247. To use the Kit, a suspect must breathe directly into an indium tube, which preserves samples in three separate chambers. See 142 Cal. App. 3d 138, 142, 190 Cal. Rptr. 319, 321 (1983). The breath trapped in each chamber can later be used to determine the suspect's blood-alcohol concentration through the use of a laboratory instrument known as a Gas Chromatograph Intoximeter, which has also been approved by the California Department of Health. App. 242–243. Because the suspect must breathe directly into the indium tube, the Kit cannot be used to preserve the same breath sample used in an Intoxilyzer test. See, *supra,* at 481–482. Other devices,

cers do not ordinarily preserve breath samples, and made no effort to do so in these cases. Respondents each claimed that, had a breath sample been preserved, he would have been able to impeach the incriminating Intoxilyzer results. All of respondents' motions to suppress were denied. Respondents Ward and Berry then submitted their cases on the police records and were convicted. Ward and Berry subsequently petitioned the California Court of Appeal for writs of habeas corpus. Respondents Trombetta and Cox did not submit to trial. They sought direct appeal from the Municipal Court orders, and their appeals were eventually transferred to the Court of Appeal to be consolidated with the Ward and Berry petitions.[4]

The California Court of Appeal ruled in favor of respondents. After implicitly accepting that breath samples would be useful to respondents' defenses, the court reviewed the available technologies and determined that the arresting officers had the capacity to preserve breath samples for respondents. 142 Cal. App. 3d, at 141–142, 190 Cal. Rptr., at 320–321. Relying heavily on the California Supreme Court's decision in *People* v. *Hitch*, 12 Cal. 3d 641, 527 P. 2d 361 (1974), the Court of Appeal concluded: "Due process demands simply that where evidence is collected by the state, as it is with the intoxilyzer, or any other breath testing device, law enforcement agencies must establish and follow rigorous and

---

similar in function to the Kit, can be attached to an Intoxilyzer and used to collect the air that the Intoxilyzer purges, see Brief for Respondents 18–19, but none of these devices has yet received approval from the California Department of Health, see Reply Brief for Petitioner 3–4.

[4] The California Court of Appeal expressed some doubt whether respondents Trombetta and Cox were entitled to appeal their suppression orders and ultimately ordered that their appeals be dismissed. 142 Cal. App. 3d, at 140, 143, 190 Cal. Rptr., at 320, 323. The court, however, ruled on the merits of their claims and thereby exercised jurisdiction over their appeals. *Id.*, at 144, 190 Cal. Rptr., at 323. As to Trombetta and Cox, the Court of Appeal decision was comparable to a judgment affirming a suppression order, which is reviewable in this Court under 28 U. S. C. § 1257(3). Cf., *e. g.*, *Michigan* v. *Clifford*, 464 U. S. 287 (1984).

systematic procedures to preserve the captured evidence or its equivalent for the use of the defendant." 142 Cal. App. 3d, at 144, 190 Cal. Rptr., at 323.[5] The court granted respondents Ward and Berry new trials, and ordered that the Intoxilyzer results not be admitted as evidence against the other two respondents. The State unsuccessfully petitioned for certiorari in the California Supreme Court, and then petitioned for review in this Court. We granted certiorari, 464 U. S. 1037 (1984), and now reverse.

---

[5] *People* v. *Hitch* involved another device used to measure blood-alcohol concentrations. With that device, a suspect's breath bubbles through a glass ampoule containing special chemicals that change colors depending on the amount of alcohol in the suspect's blood. 12 Cal. 3d, at 644, 527 P. 2d, at 363–364. In keeping with California procedures, law enforcement officials in *Hitch* discarded the ampoule after they had completed their testing, even though the ampoule might have been saved for retesting by the defendant. Relying on this Court's decisions in *Brady* v. *Maryland*, 373 U. S. 83 (1963), and *Giglio* v. *United States*, 405 U. S. 150, 153–154 (1972), the California Supreme Court concluded that the Due Process Clause is implicated when a State intentionally destroys evidence that might have proved favorable to a criminal defendant. 12 Cal. 3d, at 645–650, 527 P. 2d, at 364–370. The *Hitch* decision was noteworthy in that it extrapolated from *Brady*'s disclosure requirement an additional constitutional duty on the part of prosecutors to preserve potentially exculpatory evidence. See Note, The Right to Independent Testing: A New Hitch in the Preservation of Evidence Doctrine, 75 Colum. L. Rev. 1355, 1364–1368 (1975); cf. *United States* v. *Bryant*, 142 U. S. App. D. C. 132, 141, 439 F. 2d 642, 651 (1971) (Wright, J.) (Government must make " 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made").

For a number of years, there was uncertainty whether the California courts would extend the *Hitch* decision to the Intoxilyzer. In *People* v. *Miller*, 52 Cal. App. 3d 666, 125 Cal. Rptr. 341 (1975), a Court of Appeal panel refused to extend *Hitch* because the Intoxilyzer does not reduce breath samples to a preservable form comparable to the ampoules created with the device involved in *Hitch*. The Court of Appeal in *Trombetta* declined to follow *Miller*, and reasoned that as long as there were other methods of preserving specimens (such as the Indium Tube Kit, see n. 3, *supra*), the State was obliged to preserve a breath sample equivalent to the one used in the Intoxilyzer. 142 Cal. App. 3d, at 143–144, 190 Cal. Rptr., at 322–323.

## II

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States* v. *Valenzuela-Bernal,* 458 U. S. 858, 867 (1982). Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

The most rudimentary of the access-to-evidence cases impose upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath. *Napue* v. *Illinois,* 360 U. S. 264, 269–272 (1959); see also *Mooney* v. *Holohan,* 294 U. S. 103 (1935). But criminal defendants are entitled to much more than protection against perjury. A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. *Brady* v. *Maryland,* 373 U. S., at 87. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. *United States* v. *Agurs,* 427 U. S., at 112. The prosecution must also reveal the contents of plea agreements with key government witnesses, see *Giglio* v. *United States,* 405 U. S. 150 (1972), and under some circumstances may be required to disclose the identity of undercover informants who possess evidence critical to the defense, *Roviaro* v. *United States,* 353 U. S. 53 (1957).

Less clear from our access-to-evidence cases is the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession. On a few occasions, we have suggested that the Federal Government might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial. For instance, in *United States* v. *Marion*, 404 U. S. 307, 324 (1971), and in *United States* v. *Lovasco*, 431 U. S. 783, 795, n. 17 (1977), we intimated that a due process violation might occur if the Government delayed an indictment for so long that the defendant's ability to mount an effective defense was impaired. Similarly, in *United States* v. *Valenzuela-Bernal, supra*, we acknowledged that the Government could offend the Due Process Clause of the Fifth Amendment if, by deporting potential witnesses, it diminished a defendant's opportunity to put on an effective defense.[6] 458 U. S., at 873.

We have, however, never squarely addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants. The absence of doctrinal development in this area reflects, in part, the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Cf. *United States* v. *Valenzuela-Bernal, supra*, at 870. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can

---

[6] In related cases arising under the Sixth and Fourteenth Amendments, we have recognized that criminal defendants are entitled to call witnesses on their own behalf and to cross-examine witnesses who have testified on the government's behalf. See *Davis* v. *Alaska*, 415 U. S. 308 (1974); *Washington* v. *Texas*, 388 U. S. 14 (1967).

grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing—as the California Court of Appeal did in this case—the State's most probative evidence.

One case in which we have discussed due process constraints on the Government's failure to preserve potentially exculpatory evidence is *Killian* v. *United States*, 368 U. S. 231 (1961). In *Killian*, the petitioner had been convicted of giving false testimony in violation of 18 U. S. C. § 1001. A key element of the Government's case was an investigatory report prepared by the Federal Bureau of Investigation. The Solicitor General conceded that, prior to petitioner's trial, the F. B. I. agents who prepared the investigatory report destroyed the preliminary notes they had made while interviewing witnesses. The petitioner argued that these notes would have been helpful to his defense and that the agents had violated the Due Process Clause by destroying this exculpatory evidence. While not denying that the notes might have contributed to the petitioner's defense, the Court ruled that their destruction did not rise to the level of constitutional violation:

> "If the agents' notes . . . were made only for the purpose of transferring the data thereon . . . , and if, having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practices, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right." *Id.*, at 242.

In many respects the instant case is reminiscent of *Killian* v. *United States*. To the extent that respondents' breath samples came into the possession of California authorities, it was for the limited purpose of providing raw data to the

Intoxilyzer.[7] The evidence to be presented at trial was not the breath itself but rather the Intoxilyzer results obtained from the breath samples. As the petitioner in *Killian* wanted the agents' notes in order to impeach their final reports, respondents here seek the breath samples in order to challenge incriminating tests results produced with the Intoxilyzer.

Given our precedents in this area, we cannot agree with the California Court of Appeal that the State's failure to retain breath samples for respondents constitutes a violation of the Federal Constitution. To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady* v. *Maryland* and its progeny. In failing to preserve breath samples for respondents, the officers here were acting "in good faith and in accord with their normal practice." *Killian* v. *United States, supra,* at 242. The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.

More importantly, California's policy of not preserving breath samples is without constitutional defect. Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.[8]

---

[7] We accept the California Court of Appeal's conclusion that the Intoxilyzer procedure brought respondents' breath samples into the possession of California officials. The capacity to preserve breath samples is equivalent to the actual possession of samples. See n. 5, *supra.*

[8] In our prosecutorial disclosure cases, we have imposed a similar requirement of materiality, *United States* v. *Agurs,* 427 U. S. 97 (1976), and have rejected the notion that a "prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel." *Id.,* at 111; see also *Moore* v. *Illinois,* 408 U. S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case").

To meet this standard of constitutional materiality, see *United States* v. *Agurs*, 427 U. S., at 109–110, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case.

Although the preservation of breath samples might conceivably have contributed to respondents' defenses, a dispassionate review of the Intoxilyzer and the California testing procedures can only lead one to conclude that the chances are extremely low that preserved samples would have been exculpatory. The accuracy of the Intoxilyzer has been reviewed and certified by the California Department of Health.[9] To protect suspects against machine malfunctions, the Department has developed test procedures that include two independent measurements (which must be closely correlated for the results to be admissible) bracketed by blank runs designed to ensure that the machine is purged of alcohol traces from previous tests. See *supra*, at 481–482. In all but a tiny fraction of cases, preserved breath samples would simply confirm the Intoxilyzer's determination that the defendant had a high level of blood-alcohol concentration at the time of the test. Once the Intoxilyzer indicated that respondents were legally drunk, breath samples were much more likely to provide inculpatory than exculpatory evidence.[10]

---

[9] The Intoxilyzer has also passed accuracy requirements established by the National Highway Traffic Safety Administration of the Department of Transportation. See 38 Fed. Reg. 30459 (1973); A. Flores, Results of the First Semi-Annual Qualification Testing of Devices to Measure Breath Alcohol 10 (Dept. of Transportation 1975).

[10] The materiality of breath samples is directly related to the reliability of the Intoxilyzer itself. The degree to which preserved samples are material depends on how reliable the Intoxilyzer is. This correlation suggests that a more direct constitutional attack might be made on the sufficiency of the evidence underlying the State's case. After all, if the Intoxilyzer were

Even if one were to assume that the Intoxilyzer results in this case were inaccurate and that breath samples might therefore have been exculpatory, it does not follow that respondents were without alternative means of demonstrating their innocence. Respondents and *amici* have identified only a limited number of ways in which an Intoxilyzer might malfunction: faulty calibration, extraneous interference with machine measurements, and operator error. See Brief for Respondents 32–34; Brief for California Public Defender's Association et al. as *Amici Curiae* 25–40. Respondents were perfectly capable of raising these issues without resort to preserved breath samples. To protect against faulty calibration, California gives drunken driving defendants the opportunity to inspect the machine used to test their breath as well as that machine's weekly calibration results and the breath samples used in the calibrations. See *supra,* at 481–482. Respondents could have utilized these data to impeach the machine's reliability. As to improper measurements, the parties have identified only two sources capable of interfering with test results: radio waves and chemicals that appear in the blood of those who are dieting. For defendants whose test results might have been affected by either of these factors, it remains possible to introduce at trial evidence demonstrating that the defendant was dieting at the time of the test or that the test was conducted near a source of radio waves. Finally, as to operator error, the defendant retains the right to cross-examine the law enforcement officer who administered the Intoxilyzer test, and to attempt to raise doubts in the mind of the factfinder whether the test was properly administered.[11]

---

truly prone to erroneous readings, then Intoxilyzer results without more might be insufficient to establish guilt beyond a reasonable doubt. *Jackson* v. *Virginia,* 443 U. S. 307 (1979).

[11] Respondents could also have protected themselves from erroneous on-the-scene testing by electing to submit to urine or blood tests, see n. 2, *supra,* because the State automatically would have preserved urine and

## III

We conclude, therefore, that the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial.[12] Accordingly, the judgment of the California Court of Appeal is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

Rules concerning preservation of evidence are generally matters of state, not federal constitutional, law. See *United States* v. *Augenblick*, 393 U. S. 348, 352–353 (1969). The failure to preserve breath samples does not render a prosecution fundamentally unfair, and thus cannot render breath-analysis tests inadmissible as evidence against the accused. *Id.*, at 356. Similarly, the failure to employ alternative methods of testing blood-alcohol concentrations is of no due

---

blood samples for retesting by respondents. Respondents, however, were not informed of the difference between the various testing procedures when they were asked to select among the three available methods of testing blood-alcohol concentrations. But see Cal. Veh. Code Ann. § 13353.5 (West 1971) (enacted in 1983) (requiring suspects to be informed that samples will be retained only in urine and blood tests). To the extent that this and other access-to-evidence cases turn on the underlying fairness of governmental procedures, it would be anomalous to permit the State to justify its actions by relying on procedural alternatives that were available, but unknown to the defendant. Similarly, it is irrelevant to our inquiry that California permits an accused drunken driver to have a second blood-alcohol test conducted by independent experts, since there is no evidence on this record that respondents were aware of this alternative.

[12] State courts and legislatures, of course, remain free to adopt more rigorous safeguards governing the admissibility of scientific evidence than those imposed by the Federal Constitution. See, *e. g.*, *Lauderdale* v. *State*, 548 P. 2d 376 (Alaska 1976); *City of Lodi* v. *Hine*, 107 Wis. 2d 118, 318 N. W. 2d 383 (1982).

process concern, both because persons are presumed to know their rights under the law and because the existence of tests not used in no way affects the fundamental fairness of the convictions actually obtained.  I understand the Court to state no more than these well-settled propositions.  Accordingly, I join both its opinion and judgment.