[No. B008222. Second Dist., Div. Five. Dec. 6, 1985.]

THE PEOPLE, Plaintiff and Appellant, v.
HUEY PIERCE GIVENS, Defendant and Respondent.

**COUNSEL**

Ira Reiner, District Attorney, Harry B. Sondheim and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

Robert Rader for Defendant and Respondent.

**OPINION**

**FEINERMAN, P. J.**—This is a People's appeal from the trial court's order dismissing two counts of assault by means of force likely to produce great bodily injury and with a deadly weapon. (Pen. Code, § 245, subd. (a).) Dismissal of the charges against respondent was a sanction for People's alleged negligent loss or destruction of a taped interview with one of the prosecution's witnesses. We reverse the judgment of dismissal.

### BACKGROUND

About 2 or 2:30 a.m. of October 21, 1981, Edgardo Penamante (Penamante), a mechanic for Sun Valley Auto Parts (Sun Valley) was working

on a Toyota pickup when he saw a Dodge van approach. Penamante drove over to investigate and a man exited from the passenger side of the van with a gun in his hand. The man pulled Penamante out of his car and dragged him by the collar toward the corner of the yard's western gate. Someone then began hitting him over the head with a hard, gun-like object.

The manager of Sun Valley, Richard Young (Young) had been resting inside his office at this time and heard a noise. He went outside armed with a gun and looked into the Dodge van which he recognized as belonging to a co-owner of Sun Valley, Alphonse Harrison (Harrison). He then started around to the back and saw Harrison striking Penamante about the head with a pistol while threatening to kill him.

Young stuck his own gun in Harrison's back and ordered Harrison to get off Penamante. As Harrison began to move, Penamante warned Young that there were two assailants. At this point, Young was shot four times by the second individual. Harrison then pulled away from Young and shot Young in the leg at point blank range. Young returned fire and heard someone say, "My face. My face. What have you done to my face?" As Young fell backwards from his other wounds, Harrison shot him again while standing over him.

During this time, Penamante went to the front door of the business office. Failing to gain entry, he went around to the back door and bumped into respondent, Huey Givens (Givens) who was holding his head. At trial, Penamante testified that it was Givens who had exited the van and taken him out of his own car at gunpoint. However, he could not identify who had struck him over the head. Penamante saw Young's gun on the ground and tried to shoot Givens but the gun was empty. Penamante then went to get a shotgun from the office but the assailants had gone by the time he returned. Penamante summoned the police and called an ambulance for Young.

About 2:50 a.m. on October 29, 1981, Givens was arrested while speeding in a Dodge van on which police had an outstanding warrant. At the time of Givens' arrest, a detective investigating the earlier shooting incident noticed that half of defendant's right eyebrow was missing and that the underlying skin was broken with a small scab. The detective then called Young to ask if he felt that one of the suspects might have been hit during the incident. Young responded that he recalled someone saying, "Oh, my face, my face."

Both Givens and Harrison were charged as codefendants with the attempted murder of Young (Pen. Code, §§ 664/187) and with one count each of assault with a deadly weapon against Young and Penamante. (Pen. Code,

§ 245, subd. (a).) On February 15, 1983, a jury acquitted the defendants of attempted murder and deadlocked on the assault with a deadly weapon charges. A mistrial was declared and the matter was then reset for trial in another trial department. On July 20, 1984, Givens' motions to suppress the testimony of prosecution witness Young and to dismiss the action were granted.

### FACTS PERTAINING TO THE LOST TAPE

In January 1982, an investigator for the district attorney's office, Edward Wean (Wean), tape recorded an interview with victim Young. Wean made no notes during the interview and handed the tape over to Deputy District Attorney Beverly Campbell (Campbell). Campbell listened to the tape with the Deputy Public Defender, Ronald Buckley (Buckley), who was representing respondent Givens. Buckley, but not Campbell, took notes while listening to the tape and Campbell had no independent recollection of the tape or its contents.

Codefendant Harrison's attorney did not become apprised of the tape until midtrial in February 1983, despite the fact that both he and Givens' attorney, Buckley, had made pretrial requests for discovery, including all tape recordings made of statements or conversations of witnesses. Buckley apparently made no other specific request for the tape he had heard because it had nothing to do "with any comments of Mr. Givens" and because Givens' name was never mentioned by Young.

Buckley informed the trial judge that he had "some notes, but . . . the entire tape involved Investigator Wean talking to Mr. Young . . . [a]nd since [Givens] . . . in no way was mentioned in any way, shape, or form, it didn't mean that much to me." Buckley continued, "[n]ow, obviously it may mean a lot more to [codefendant Harrison's attorney], but . . . when you are listening to a tape with the District Attorney, you are listening for things which you think are relevant in relation to your client. And to the best of my recollection, there wasn't anything on that tape which I felt could hurt Mr. Givens so . . . I didn't concentrate on taking every single word that was said. [¶] But I can understand [Harrison's attorney's] position. If I was representing Mr. Harrison at this particular point [i.e. during Harrison's cross-examination of Young] I would be very concerned about everything that was said, because there may be further contradictions as to what Mr. Young told Investigator Wean as opposed to what he is testifying to." Buckley indicated that he failed to inform codefendant of the tape because "it didn't mean anything to me."

While Harrison's attorney continued to cross-examine Young, the court ordered People to search for the missing tape. Outside the presence of the

jury, Attorney Buckley was then allowed to read his notes of the taped interview into the record. People informed the court that the tape was unavailable because it had been scrubbed and reused.

In denying codefendant Harrison's motion for sanctions for People's failure to provide discovery, the trial judge to whom the case was originally assigned for trial made the following findings: (1) The erasure of the tape was neither intentional nor in bad faith; (2) no showing was made that the tape had any substantial materiality; (3) the People were not withholding material evidence and the taped evidence alluded to was "without probative force on the issues at trial"; and (4) the absence of the tape would not impair the defense or deny due process.

On February 15, 1983, the trial court declared a mistrial as to the counts against Givens and Harrison charging assault with a deadly weapon. On October 14, 1983, the matter was transferred to another trial department. On May 8, 1984, codefendant Harrison filed notice of motion and motion to dismiss charges, or alternatively, to suppress the testimony of Young as evidence. Givens joined in Harrison's motion to dismiss.

On July 20, 1984, Givens's and Harrison's Penal Code section 1538.5 motions were heard. Investigator Wean testified for the defense that the standard procedure for handling tape-recorded statements of witnesses in the district attorney's office was not followed and that the deputy district attorney failed to return the tape to him for transcription and duplication. Givens argued that dismissal and not just suppression of Young's testimony was the appropriate sanction because of a conflict in testimony between Penamante and Young which could help exculpate Givens. Whereas Penamante testified that Givens was the person who left the van and initially assaulted him, Young said that it was Harrison who sat atop Penamante and beat him with a gun.

In granting Harrison's motion to suppress Young's testimony and Givens' motion to dismiss, the court stated, "[W]e're dealing with the crucial witness [Young], and particularly with Givens, who may or may not want Young to testify if he is going to lay it all off on Harrison." The court found that suppression of Young's testimony would deny Givens a "fair shot," because Young could not place Givens at the scene of the crime. Given the court's ruling, People announced that it could not proceed against Harrison, and the charges against him were also dismissed.

### DISCUSSION

This appeal is limited solely to the Givens dismissal. Appellant contends that the trial court erred in granting respondent Givens' motion to

dismiss on the basis that judicial suppression of Young's testimony deprived Givens of a favorable witness. People argue that Proposition 8 requires that relevant evidence should not be excluded in any criminal proceeding, including pretrial and postconviction motions and hearings (Cal. Const. art. I; § 28, subd. (d)) and that the federal standard articulated in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528] should be used in determining the state's duty to preserve evidence. Appellant also argues that it was error to hold that Young's testimony would have been favorable to respondent Givens and that even if the testimony were favorable, it was error to dismiss as to Givens in lieu of severance of the codefendants' cases.

■ In *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], the California Supreme Court held that the prosecution has a duty to undertake reasonable efforts to preserve material evidence whenever there exists a "reasonable possibility" that the evidence would have constituted "favorable evidence on the issue of guilt or innocence." (*Id.*, at p. 649.) In *California* v. *Trombetta, supra,* 467 U.S. 479, the United States Supreme Court reviewed the People's duty under the due process clause of the Fourteenth Amendment to take affirmative steps to preserve evidence. It set forth the contours of the obligation as follows: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

In *In re Michael L.* (1985) 39 Cal.3d 81, 86 [216 Cal.Rptr. 140, 702 P.2d 222], the California Supreme Court stated: "It is apparent that the *Trombetta* formulation of the duty-to-preserve test differs substantially from our own *Hitch* standard. It is unnecessary, however, for us to reach the question whether *Hitch* has 'survived' *Trombetta,* for we have concluded that, under the circumstances in this case, exclusion of the identification testimony is unwarranted even under our pre-*Trombetta* authority."

Similarly, in the case at bench, we find that the suppression of Young's testimony and the subsequent dismissal of charges against respondent Givens were unwarranted even under pre-*Trombetta* authority.

■ In this case, Givens' attorney not only knew of the taped interview but was permitted to hear the entire recording in the presence of the deputy district attorney. Buckley never heard his client's name mentioned and be-

lieved that "there wasn't anything on that tape which . . . could hurt Mr. Givens." In fact, Buckley told the court that the tape escaped his mind because "as far as I was concerned, it didn't mean anything to me."

It is hard to believe that counsel would so readily have forgotten the tape, if it had been in any way helpful to Givens' case. Instead, it was only when Harrison's attorney registered surprise at the existence of such a tape that Buckley "jumped on the band wagon" to join in Harrison's motion to suppress or dismiss.

Further, unlike the case against Harrison, where it appears that the only inculpatory evidence came from the witness whose statements were taped and whose credibility was challenged, other evidence, clearly more trustworthy, placed Givens at the scene of the crime. While the jury hung on Givens' complicity, we find no reasonable possibility that Givens would have fared better on the issue of his guilt or innocence were the taped interview with Young preserved. (*Hitch, supra,* 12 Cal.3d at p. 649.) Buckley sat as a guardian of Givens' interests at the replay of the tape. He noted nothing in its content which would materially affect the outcome of the case against his client. Based on Buckley's reproduction of his notes and his verbal assessment that the tape was not relevant to his client's case, we find insufficient grounds for the trial court to have dismissed People's case against Givens as a sanction for the inadvertent destruction of the Young tape. A contrary conclusion would glorify form over substance because the missing evidence had no reasonable possibility of proving favorable to the accused on the issue of guilt or innocence.

The judgment is reversed.

Ashby, J., and Eagleson, J., concurred.