**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**Johnie Bryant FLETCHER, Douglas Ray Langston and James Breedlove, Defendants-Appellees.**

**Nos. 85–2521, 85–2522 and 85–2523.**

United States Court of Appeals, Tenth Circuit.

Sept. 17, 1986.

Louis M. Fischer, Atty., Dept. of Justice, Washington, D.C. (Roger Hilfiger, U.S. Atty., and Sheldon J. Sperling, Asst. U.S. Atty., E.D.Okl., with him on the briefs), for plaintiff-appellant.

Thomas K. Moran, Tulsa, Okl., for defendant-appellee Fletcher.

Michael E. Kelly, of Kelly and Howerton, Muskogee, Okl., for defendants-appellees Langston and Breedlove.

Before McKAY, SEYMOUR, and MOORE, Circuit Judges.

SEYMOUR, Circuit Judge.

John Bryant Fletcher, Douglas Ray Langston and James Breedlove were indicted for conspiring to distribute methamphetamine in Broken Arrow, Oklahoma, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982). Fletcher was additionally charged with using a telephone to facilitate the distribution, in violation of 21 U.S.C.

§ 843(b).[1] Before trial, defendants moved to dismiss the indictment, contending that the loss by local police of certain tape recordings of conversations between defendants and an informant deprived them of potentially exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After a hearing, the district court agreed, and dismissed the indictment with prejudice. The Government brings this appeal pursuant to 18 U.S.C. § 3731 (1982), and we reverse.

## I.

## BACKGROUND

The essential facts are straightforward. Ron Jones, the alleged buyer of the methamphetamine, was an informant for the Broken Arrow Police Department. During the investigation, police surreptitiously recorded nine conversations between Jones and various individuals. Four tapes were used to make the recordings, which were transcribed by police secretaries shortly after defendants were arrested. Two of the tapes, containing five conversations, were lost after transcription and have never been found. According to the Government, the two available tapes contain four telephone conversations, three between Jones and Fletcher and the fourth between Jones and a woman who is not a party to this case. The two missing tapes contain four telephone conversations and one meeting. The telephone conversations are between Jones and Fletcher, Jones and Fletcher's sister, and Jones and two individuals not parties to this case. The recorded meeting took place in Jones' mobile home between Jones and the three defendants. Although the police transcripts of the missing tapes are available, the transcripts indicate that portions of the tapes are inaudible or unintelligible.

On the morning of trial, Fletcher's counsel told the court he had been advised that two of the tapes had been lost. The prosecutor confirmed the loss of the tapes and related his efforts to locate them.[2] A police officer who had participated in the surveillance was called by the Government and testified about the general contents of the tapes and the prosecutor's efforts to find them.

Defendants moved for dismissal of the charges. The Government argued that the loss of the tapes was not crucial because the informant and two police officers who had monitored the recording could testify about the contents of the conversations. The Government asserted that dismissal was not warranted in the absence of governmental misconduct and that no such evidence existed in this case. The Government gave the court a copy of the nine transcripts and indicated which ones were from lost tapes and who had participated in each conversation. The court and the prosecutor then had the following exchange:

"THE COURT: Well, I have read a considerable part of every page, enough to know that on every page there is 'unable to understand,' 'unable to understand,' 'unable to understand,' and then the word 'unaudible,' not inaudible but unaudible, time and time and time and time and time again. I don't know what it says. You don't either, I take it, Mr. Sperling, you don't know what those places where it says 'unable to understand' says, do you?

"MR. SPERLING: Other than those two tapes that I have and have heard, no, Your Honor.

"THE COURT: Well, I know. I'm talking about on this last conversation. You don't know whether it's exculpatory or is not exculpatory, do you?

---

1. Bobby Joe Fletcher and James Allan Chandler were also named in the conspiracy count and were additionally charged with distributing methamphetamine, in violation of 21 U.S.C. § 841(a)(1). They pled guilty before trial to a different charge and thus are not directly involved in this appeal.

2. The prosecutor stated that he had neither seen nor heard the tapes and knew of their existence only because of the transcripts, although he had participated in prosecuting this matter in state court before he joined the United States Attorney's office.

"MR. SPERLING: I don't know what that information is.

"THE COURT: And I don't either. And that's the problem.

. . . .

"THE COURT: No, the issue isn't whether or not this would be admissible. It just would not.

"MR. SPERLING: Right, I understand that.

"THE COURT: Absolutely not admissible. *The only issue is whether or not there is the possibility, a real possibility of there being some exculpatory material in that and the others such that the—and now that it can't be cured because you tell me that the tapes are lost, whether or not the Court ought to dismiss the case.*

"MR. SPERLING: Your point is well taken, Your Honor. The portions that are inaudible, I don't know what to say about that. If it's inaudible and the transcriber says that it's inaudible, I'm left with the matter of proof.

"THE COURT: Or, in addition to that—excuse my interruption—in addition to that, whether or not they just left out something, didn't type it because it was exculpatory. You know, we're talking about fairness, what is fair."

Rec., vol. II, at 50–52 (emphasis added).

The court thereafter ruled from the bench that the indictment should be dismissed, stating:

"[THE COURT:] The defendant claims that Government in this case has failed to produce evidence which is exculpatory. The Government has the burden to produce the evidence in order for the Court to make a decision concerning this important issue. The Government has the responsibility to safeguard the evidence so if this question is brought to the attention of the Court the Court can make a decision as to whether or not it is exculpatory.

"In this case the Government and its agents, who become the Government, have failed to safeguard and produce the evidence claimed to be exculpatory. *This evidence evidently concerns a key Government witness, Mr. Lay, and concerns—may or may not concern the defendants.* There has not been—I have given the Government all the opportunity I know how, but *there has not been a satisfactory explanation as to its disappearance or its contents, and the Court cannot examine it to determine if it is exculpatory.*

"This indictment was returned June 7th, 1985, and this is September 11th. It was continued from one docket to another at the Government's request. The tapes will never be available for examination by the Court or the defendants. *This is prejudicial to the defendants. The problem cannot be cured."*

*Id.* at 62 (emphasis added). On appeal, the Government argues that the dismissal of the indictment was erroneous because the district court (1) applied the wrong test to assess lost evidence which is potentially exculpatory, and (2) made a finding of prejudice without considering alternative means by which defendant could obtain comparable evidence.

## II.

## LOSS OF POTENTIALLY EXCULPATORY EVIDENCE

The Supreme Court recently discussed the prosecution's duty to preserve potentially exculpatory evidence in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). *Trombetta* involved a police practice of having suspected drunk drivers submit to a breath analysis test and then routinely destroying the breath samples after a blood alcohol content reading was obtained. In reversing the state supreme court's holding that the test results must be suppressed, the Court analogized to situations in which evidence is destroyed through prosecutorial neglect or oversight and noted the difficulty both of assessing the importance of lost material and of choosing between the drastic remedies of suppression and dismissal. *See id.* at 486–

87, 104 S.Ct. at 2532–33. The Court then held that the destruction of the breath samples did not violate the Due Process Clause:

"To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and its progeny. In failing to preserve breath samples for respondents, the officers here were acting 'in good faith and in accord with their normal practice.' *Killian v. United States* [368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961)]. The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.

"More importantly, California's policy of not preserving breath samples is without constitutional defect. Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S. [97], at 109–110 [96 S.Ct. 2392, 2400, 49 L.Ed.2d 342], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case."

*Id.* at 488–89, 104 S.Ct. at 2534 (footnote omitted).[3]

We have applied the *Trombetta* definition of materiality in the context of potentially exculpatory evidence that was not preserved by the Government. In *United States v. Martinez*, 744 F.2d 76, 79–80 (10th Cir.1984), we held that a clerical error by police resulting in the destruction of a bomb did not warrant dismissing the indict-

ment under the *Trombetta* standard when defendant's arguments that the missing evidence might have contained exculpatory information were "based purely on speculation and conjecture." *Id.* at 80. "*Trombetta* makes clear that the mere possibility that evidence might aid the defense does not satisfy the constitutional materiality standard...." *United States v. Webster*, 750 F.2d 307, 333 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 2341, 85 L.Ed.2d 856 (1985).

■ In this case, *Trombetta* was not argued to the district court. The court dismissed the indictments after finding only that the inaudible portions of the tapes created a "possibility" that exculpatory material had been lost and stating that the resulting prejudice could not be cured. As set forth above, the possibility that the evidence might have been exculpatory is not sufficient under *Trombetta*. Absent evidence of police or prosecutorial bad faith or misconduct, dismissal of an indictment is warranted only if the missing evidence possesses an exculpatory value that was apparent before the evidence was destroyed. *Trombetta* also requires a finding that the defendant would be unable to obtain comparable evidence by other reasonably available means. *See Trombetta*, 467 U.S. at 488–89, 104 S.Ct. at 2533–34; *Martinez*, 744 F.2d at 80.

■ These assessments should be made in the first instance by the district court. Accordingly, the dismissal of the indictment is reversed and the case is remanded for further proceedings consistent with this opinion.

---

3. This standard also applies when a district court chooses to suppress evidence derived from the lost or destroyed material rather than to dismiss the indictment. *See Trombetta*, 467 U.S. at 482–84, 487–89, 104 S.Ct. at 2530–32, 2533–34.