Major CRANE, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

March 12, 1987.

J. David Niehaus, Daniel T. Goyette, Frank W. Heft, Jr., Office of the Jefferson Dist. Public Defender, Louisville, for appellant.

David L. Armstrong, Atty. Gen., John S. Gillig, Virgil W. Webb, Asst. Attys. Gen., Frankfort, for appellee.

OPINION OF THE COURT

Appellant was convicted of wanton murder committed during the course of an attempted robbery. While police were investigating appellant's involvement in another crime, he confessed to them that he had committed the murder and consented to the taping of his confession. At trial appellant pleaded not guilty and objected to the admission in evidence of the confession.

The trial court, after a hearing, ruled that the confession was voluntary and admitted it in evidence. Appellant then sought to introduce evidence concerning the circumstances under which the confession was obtained. The trial court refused to admit such evidence, and it was placed in the record by avowal.

On appeal appellant maintained that the circumstances under which his confession was obtained should have been admitted in evidence because they would have some bearing on the credibility of his confession.

The testimony which was not admitted into evidence was placed in the record by avowal. It consisted of the testimony of two police officers as follows:

"MR. JEWELL: At this time, we would like to put on our avowal evidence, Judge, which we reserved at trial, that being Detective Branham.

"THE COURT: Please take the stand, Detective.

"MR. JEWELL: And we'd also have Detective Burbrink. I'll not ask that he be separated since this is going in by avowal.

"THE COURT: Detective, you remain under the same oath as was previously administered to you. This evidence is offered into the record by way of an avowal, it having been ruled by the Court that it is not appropriate to have it brought before the jury."

AVOWAL TESTIMONY OF DETECTIVE
WAYNE BRANHAM

"BY MR. JEWELL:

"Q 1   Again, state your name.

"A   Detective Wayne Branham.

"Q 2   Detective Branham, you were involved in the taking of the statement from the Defendant, Major Crane, were you not?

"A   Yes sir.

"Q 3   On August 14th, did you receive a call from the City Police to meet them somewhere in reference to Major Crane?

"A   Yes sir, I did.

"Q 4   About what time was this?

"A   I believe it was about 6:50.  I didn't bring my report up with me.

"Q 5   And where did you meet the city police at?

"A   I first met the city police at the Louisville Police Department Youth Bureau and I proceeded over to the Youth Center.

"Q 6   Did you talk with the Defendant, Major Crane, at the Youth Bureau?

"A   No.

"Q 7   Did you talk to him at the Detention Center?

"A   Yes sir, I did.

"Q 8   Did you arrive there at approximately 7:00 o'clock?

"A   That would probably have been about the correct time, yes sir.

"Q 9   And you then began questioning or talking with Major Crane at that time?

"A   Yes sir.

"Q 10   Now you took a waiver of rights at 7:45, correct?

"A   Yes sir, I believe so.

"Q 11   And the recorded statement did not begin until 7:50, correct?

"A   That is correct.

"Q 12   When you were at the Youth Center with Major Crane, were any of the social workers at the Youth Center present with him during your questioning?

"A   During the questioning, no sir.

"Q 13   Was any member of his family present?

"A   No sir.

"Q 14   Was anybody present besides Major and the police officers?

"A   No sir, there was not.

"Q 15   The room in which you did this questioning at the Youth Center, about how big was it?

"A   It is a small office.  I'll estimate it at maybe probably 10' × 10' maybe.

"Q 16   And you were present at the questioning?

"A   Yes sir.

"Q 17   And Detective Milburn?

"A   Yes sir.

"Q 18   Detective Burbrink?

"A   Yes sir.

"Q 19   Detective Highland?

"A   Yes sir.

"Q 20   And was there any other persons present?

"A   I believe Sergeant Cummings was in the room too, with the Louisville Police Department.

"Q 21   And while you all were in this office, did you have the door open or closed?

"A   Sir, I don't recall whether it was open.

"Q 22   Does this office have any windows in it?

"A   No sir.

"Q 23   And this is the office where you first started talking a little after seven until the statement ended at 8:40, correct?

"A   That is correct.  That was our office that was given to us there by the workers at the Center.

"Q 24   No worker from the Center stayed in there for the questioning, correct?

"A   No sir.

"Q 25   Did you request that one stay in there?

"A   No sir.

"Q 26   At any time, did you see Major Crane use the phone to call a family member?

"A   No sir.

"Q 27   At any time, did you, yourself, talk to the mother of Major Crane that evening?

"A   That evening?

"Q 28   While questioning was going on.

"A   No sir.

"Q 29  Say prior to 8:40?

"A  No sir.

"MR. JEWELL: I have no further questions."

### EXAMINATION OF DETECTIVE BRANHAM ON AVOWAL BY MR. DAVID STENGEL

"Q 1  Sir, how was Major Crane being treated during the time you were there?

"A  He was treated well. I think at one point, we asked him if he wanted a drink. He was seated at a table, as I recall, or a desk-type table.

"Q 2  Did you get him any sort of soft drinks, potato chips, anything like that?

"A  I know he was asked. I don't remember whether he requested one. If he did, I am sure he got one but I don't remember.

"Q 3  Would you describe his demeanor at the time.

"A  His demeanor was he was calm at the time. It was just a conversation-type situation.

"Q 4  Were you all seated, standing? What was the scene in there? Did you all have enough chairs to go around?

"A  As I recall, I was seated and I believe there was a couple of more chairs. I don't remember the exact arrangements. There may have been one or two officers standing.

"Q 5  Had you had any discussion prior to the time you started tape recording that statement?

"A  With?

"Q 6  With Crane.

"A  I talked to him briefly before but we went right into the recording.

"Q 7  Were any threats, promises, or anything else made to him there at that time?

"A  No sir.

"Q 8  Are you aware of attempts to contact his family?

"A  I am not aware, no sir. The workers there at the Center may have been attempting to contact them. I don't know.

"Q 9  At one time, he requested that he go to the restroom, is that correct?

"A  That is correct.

"Q 10  And did he go?

"A  Yes sir, he did.

"Q 11  In your presence, was he abused, threatened or anything else in any way?

"A  No sir, he was not.

"MR. STENGEL: Thank you, sir.

"MR. JEWELL: I have no further questions.

"THE COURT: Thank you, you may stand down. Other avowal evidence?

"MR. JEWELL: Detective Burbrink.

"THE COURT: Detective, you remain under the same oath as was previously administered to you."

### AVOWAL TESTIMONY OF DETECTIVE DON BURBRINK

#### EXAMINATION BY MR. JEWELL:

"Q 1  Please state your name for the record, please.

"A  Detective Donald Burbrink, Louisville Division of Police, Fourth District.

"Q 2  Detective Burbrink, what is the first time you came in contact with Major Crane on August 7th?

"A  Approximately 1752 hours, 5:52 in the afternoon.

"Q 3  5:52 p.m.

"A  Yes sir.

"Q 4  And you all remained at the substation for awhile after that, did you not?

"A  We left the substation at 1825. So by the time we got into the district, it was about 1800 or six o'clock, 6:00 p.m. So we were there approximately 25 minutes or enough time for me to type up a slip.

"Q 5  And then you took him to the Youth Bureau which is in Louisville Police Headquarters, correct?

"A  Yes sir.

"Q 6  And how long did you remain there?

"A  According to my time, we arrived there at 1838 and we left there at 1859.

"Q 7 Then you proceeded to the Youth Center, correct?

"A Yes sir.

"Q 8 Where upon arrival after you all went into the Youth Center, you all went to a room for questioning, correct?

"A Correct.

"Q 9 And you had called the County to come meet you at the Youth Bureau, correct?

"A Yes sir.

"Q 10 Now when you arrived at the Detention Center, the room that you went to, was it down a hall from the admissions area?

"A There is a long desk there in the admission area. There is a doorway there. You come out the door; you go to your left and it is about 10 yards down the hall.

"Q 11 And this room—would you agree with the description we had of about 10' × 10' perhaps?

"A 10' × 10', 12' × 12', something like that, yes sir.

"Q 12 And this room had no windows?

"A That is correct.

"Q 13 And during questioning, I am talking about from this time until the tape recorded statement ended at 8:40, was anybody else allowed in? Did anybody else come into the room besides Major Crane and the police officers?

"A No sir, Detective Highland went back and forth getting Major some soft drinks and potato chips, etc., but nobody else entered, no sir.

"Q 14 No worker, no family member, nobody else?

"A No sir.

"Q 15 And you were aware at this time that Major Crane was 16 years old, correct?

"A Yes sir.

"MR. JEWELL: I have no further questions."

EXAMINATION BY MR. STENGEL:

"Q 1 Sir, did you make any attempts to contact Major Crane's family?

"A Yes sir, I did, several times. When we first picked him on up and brought him to the Fourth District Substation, I tried to call the mother. I talked to an aunt at that time and told her what was going on with his charges, etc., and where he could be found and she said she would contact the mother and bring her to the Detention Center. I told her about what the timing would be. I called back again at 1912 when we first arrived at the Detention Center and there was no answer at home. And at that time, I assumed the mother and aunt were on the way. We left specific instructions with the people at the front desk, if the mother of Major Crane or an aunt or any family member were to come in, to take them back to the room where we were questioning him.

"I called again before the statement started at 1945 and again there was no answer. After the statement, we tried repeatedly to call and finally talking to his grandmother later on.

"Q 2 Do you have a list of the repeated lies there?

"A Yes. Seven attempts of calling from 2043 until 2128.

"Q 3 And you say Detective Highland was coming and going with soft drinks, etc. for Major?

"A Yes.

"Q 4 Did Major express any sort of discomfort or fear or any other negative feelings while you all were talking to him?

"A No sir.

"Q 5 Describe his demeanor and his— well, first, his demeanor.

"A He was calm just like you or I sitting here, just matter of fact about everything.

"Q 6 Could he be described as talkative?

"A Oh, he was definitely talkative.

"Q 7 You talked about a considerable amount of things other than simply this offense, isn't that correct?

"A Yes sir, that is correct.

"Q 8 And that was freely given or apparently freely given from Major to you?

"A Yes sir.

"Q 9 Do you remember any requests that Major made that weren't acted upon or weren't granted?

"A None whatsoever.

"Q 10 Any requests to call home?

"A No sir, never requested to call home or requested to call anybody.

"MR. STENGEL: Okay, thank you, sir."

REEXAMINATION BY MR. JEWELL:

"Q 1 Detective Burbrink, when you talked to the aunt over the phone, did you tell her that Major was being questioned in regards to a murder charge?

"A He was not being questioned about a murder charge at that time, sir; so we did not have any reason to tell her that.

"Q 2 So as far as you know, at least from yourself, the family did not learn that he was being questioned on a murder charge prior to the statement, correct?

"A That is correct, yes sir.

"MR. JEWELL: I have no further questions.

"THE COURT: Will counsel for the Defendant state upon the record again the purpose of this avowal.

"MR. JEWELL: The purpose of the avowal, Judge, was earlier today, the Commonwealth moved by motion in limine that we not be allowed to go into the facts and circumstances surrounding the confession, such as how long the young man was in police custody, the fact that he had nobody there with him, since they felt that was heard at the suppression hearing and should not be heard in open court. We then stated we felt we had a right to ask the police officers those specific questions as it went to both voluntariness and credibility to be given a confession by a 16–year old in police custody at least a couple of hours with no family member present. The Court sustained the Commonwealth's motion, overruling

our objection. Therefore, we felt we had to get this evidence in by avowal."

On appeal to this court, no issue was raised as to the ruling of the trial judge as to the voluntariness of the confession. The attack was centered solely on the claim that the excluded evidence was admissible not on the question of the voluntariness but upon the issue of the credibility of the confession.

We concluded that the length of time of questioning, the number of police officers engaged in the questioning, the size of the room in which the questioning took place, and factors of like import would pertain to the credibility of the confession only to the extent that such factors might indicate coercion, ergo involuntariness, and since voluntariness was not a jury issue, the evidence was properly excluded. We affirmed the judgment.

The United States Supreme Court reversed, holding that the excluded evidence was admissible on the issue of the credibility of the confession. The court held, however, that the error is subject to harmless error analysis and remanded to this court for a determination of that matter. *Crane v. Kentucky*, 476 U.S. ——, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).

In his confession, the appellant made statements which were demonstrably untrue. He said he used a .357 magnum weapon, but the weapon used in the robbery was a .32 caliber pistol. He said he fled from the premises when the owner activated an alarm which created a lot of noise. In fact, the store did not have an alarm system. He said, in his confession, that the robbery occurred in the afternoon during daylight and that $300.00 was taken, when in fact an attempted robbery took place after 10:00 p.m. and no money was reported missing.

These discrepancies might reasonably reflect upon the credibility of the confession, and the defense was allowed to show all these discrepancies. The record further discloses that portions of the excluded testimony came before the jury from other sources.

The jury heard testimony that the appellant was questioned by several police officers. The appellant was present at trial, and the jury could observe his youth and appearance. The approximate time of his arrest and the time the officers commenced taping his statement was before the jury.

In the opening statement to the jury, appellant's counsel claimed the appellant was brought to the detention center for questioning at 7:20 p.m. and was turned over to the custody of the center at 9:00 p.m.

The excluded evidence would have added this additional information from Detectives Burbrink and Branham: that appellant was arrested at 5:50 p.m. and remained at the police substation until 6:25 p.m., just long enough to type up some papers; that appellant was then transported to the youth bureau in Louisville police headquarters, arriving there at 6:38 p.m.; that at 6:59 p.m. he was taken to the detention center where he was met by county officers; that he was questioned in an office approximately 10′ × 10′ or 12′ × 12′ square at the detention center until approximately 7:50 p.m., when a recorded statement was taken which ended at 8:40 p.m.; that no member of his family was present, but officers repeatedly attempted to get in contact with his mother and did get in touch with his aunt and requested the family to come to the detention center; that nobody entered the office when appellant was questioned except four or five officers; that one of the officers was in and out of the room getting soft drinks and potato chips for appellant; that appellant was seated during the questioning; that he appeared calm; that the questioning was a conversational-type situation; and that appellant was treated well.

An uncle of appellant who was a participant in the robbery gave a statement to the police that appellant attempted the robbery and shot the store clerk. Geraldine Crane, the mother of appellant, in referring to a conversation with her son, stated to the investigating officers, "He said that he robbed, he killed, he shot a man, but he didn't know the man was dead until yesterday." She denied at trial, however, that appellant told her he shot a man.

The test for harmless error is whether there is any reasonable possibility that absent the error the verdict would have been different. *Commonwealth v. McIntosh*, Ky., 646 S.W.2d 43 (1983). Because the test is phrased in terms of "reasonable possibility," an error of constitutional proportions must be shown to be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The question here is not whether the jury reached the right result regardless of the error, but whether there is a reasonable possibility that the error might have affected the jury's decision.

This jury had knowledge of the many inconsistencies in appellant's confession, and were aware of appellant's youth and the fact that he had been questioned by four or more police officers at police headquarters. None of this knowledge caused the jury to discredit appellant's confession.

In view of the incriminatory testimony of appellant's uncle and mother, it is inconceivable to us that the jury would have reached any other result in this case had they had the additional testimony concerning the exact length of time appellant was questioned; the exact size of the office where the questioning took place; that none of his family was present, although efforts were made to secure their presence; that appellant was provided with soft drinks, etc.; was questioned in a conversational tone; and treated well by the officers.

It is our view that beyond a reasonable doubt there is no reasonable possibility the verdict of the jury would have been different had the erroneous exclusion of evidence not occurred.

The judgment is affirmed.

STEPHENS, C.J., and GANT, VANCE, and WINTERSHEIMER, JJ., concur.

LEIBSON, J., dissents by separate attached opinion in which LAMBERT, J., joins.

STEPHENSON, J., not sitting.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

I was the lone dissenter when Crane's appeal was originally heard in the Kentucky Supreme Court, and his conviction affirmed. The reason for my dissent was that the trial court had improperly suppressed evidence offered to show circumstances of "intimidation surrounding the taking of the confession, ... relevant to its credibility." 690 S.W.2d 753, 755. The trial judge's decision that the confession was not coerced, made when he decided to admit it, did "not preempt the jury's need to consider evidence about coercion in deciding guilt." *Id.*

The offered evidence, which was heard at the suppression hearing but suppressed at the trial, served *multiple purposes,* because the same evidence was relevant to both voluntariness and credibility, and thus "should be admitted when offered for the proper purpose." Lawson, *Kentucky Evidence Law Handbook,* § 1.10(A) (2d ed. 1984).

The United States Supreme Court, with a rare showing of unanimity in the decision of a criminal constitutional law question, reversed the Kentucky Supreme Court, applying the same principles and reasoning set out in my previous Dissenting Opinion. See *Crane v. Kentucky,* 476 U.S. ——, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). As stated in the United States Supreme Court's decision:

> "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528 [2532], 81 L.Ed.2d 413 (1984); ... That opportunity would be an empty one if the state were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." At ——, 106 S.Ct. at 2146, 90 L.Ed.2d at 645.

However, rather than remanding this case back to the trial court for a new trial, the United States Supreme Court elected to remand this case back to the Kentucky Supreme Court for "harmless error analysis." *Id.* at ——, 106 S.Ct. at 2147, 90 L.Ed.2d at 646. The Court's decision to do this is rather strange when we consider this statement in its opinion:

> "We do, however, think it plain that introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance of [Crane's defense] succeeding." *Id.* at ——, 106 S.Ct. at 2147, 90 L.Ed.2d at 645.

The Commonwealth had contended in the United States Supreme Court that "the very evidence excluded by the trial court's ruling ultimately came in through other witnesses." *Id.* at ——, 106 S.Ct. at 2147, 90 L.Ed.2d at 646. Rather than examine this contention, the United States Supreme Court remanded this case back to our Court to do so.

Since we are confronted with trial error of constitutional magnitude, "harmless error analysis" puts the burden on the Commonwealth to prove that excluding the evidence was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Considering that the evidence excluded was admittedly critical to the defense, its exclusion could hardly be harmless beyond a reasonable doubt unless the same evidence was elsewhere presented to the jury, and in an equally comprehensible form. Such is not the case.

On the contrary, as presented to the jury the evidence concerning the circumstances surrounding the taking of Crane's confession was partially incomplete, and confusingly presented. Defense counsel had made this point, coercion in the circumstances surrounding the taking of the confession, the principal thrust of his opening statement. After the trial court ordered the evidence suppressed, the jury was left with the impression that the defense was left with a failure of proof. When a jury is told in opening statement what a lawyer

expects to prove, and he subsequently fails to prove it, this significantly affects the credibility of his entire case. A.S. Julian, *Opening Statements*, Ch. 2, § 2.03.50 (cum. supp. 1985).

The defense proposed to prove that Crane was a sixteen year old boy who was questioned nearly two hours by five police officers in a small 10' × 10', windowless room in the absence of any family member or social worker. He was questioned about a number of crimes, and a number of things that he stated in his confession as to the present crime were demonstrably untrue. The confession was in error about the type of weapon actually used, about the setting off of an alarm system when there was no alarm system, and about the robbery occurring in daylight hours when in fact it happened at 10:00 p.m. Additionally, in the confession Crane stated that he got $400 in the robbery, when the evidence was that no money was taken.

The evidence related to the boy's age and the circumstances of his questioning, which supposedly renders the suppression of the avowal evidence harmless, came in only tangentially and by inference. It omitted details and it fell far short of a complete picture of the circumstances of the interrogation as the defendant wished to present them.

In summing up the opinion, the majority opines, "[i]n view of the incriminatory testimony of appellant's uncle and mother, it is inconceivable to us that the jury would have reached any other result in this case had they had the additional testimony...." However, the evidence introduced during trial from these witnesses to corroborate Crane's confession was brought out in conflicting testimony with numerous denials.

This in no way suggests that I believe that Crane's confession was coerced, that it lacked credibility, or that Crane is not guilty. But this is not our decision to make. Crane was entitled to present this claim of coercion in as clear and comprehensible a fashion as the law of evidence permits. It is for the jury to pass on its credibility in deciding the question of his guilt. Crane did not get this chance.

I dissent.

LAMBERT, J., joins in this dissent.