IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

FILED

January 25, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | No. M1999-02437-CCA-RM-CD |
| | ) | No. 01C01-9406-CR-00207 |
| Appellee, | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Hon. J. Randall Wyatt, Jr., Judge |
| | ) | |
| RICKY HILL KRANTZ, | ) | (First degree murder and aggravated assault) |
| | ) | |
| Appellant. | ) | |

For the Appellant:                              For the Appellee:

David M. Siegel                              Charles W. Burson
Jeff Powell                                  Attorney General of Tennessee
Assistant Public Defenders                        and
Stahlman Building                            Christina S. Shevalier
211 Union Street                             Assistant Attorney General of Tennessee
Nashville, TN 37201-5066                     450 James Robertson Parkway
(AT TRIAL)                                   Nashville, TN 37243-0493

Karl Dean                                    Victor S. Johnson, III
District Public Defender                     District Attorney General
   and                                             and
Jeffrey A. DeVasher                          Katrin Novak Miller
Michele S. Hall                              Nicholas Bailey
Sheila Jones                                 Assistant District Attorneys General
Assistant Public Defenders                   102 Metro Courthouse
Stahlman Bldg.                               Nashville, TN 37201
211 Union Street
Nashville, TN 37201-5066
(ON APPEAL)

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

1

The Tennessee Supreme Court remanded this case to us for reconsideration of our prior holding regarding the state's loss or destruction of the defendant's blood sample in light of State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). We previously held that the defendant's right to due process was not violated by the state's failure to preserve the blood sample because the failure did not result from bad faith on the part of the police. The bad faith standard is from Arizona v. Youngblood, 488 U.S. 55, 57-58, 109 S. Ct. 333, 337 (1988) and has previously been used by this court. See, e.g., State v. Eldridge, 951 S.W.2d 755, 778 (Tenn. Crim. App. 1997). However, in Ferguson, our supreme court rejected the bad faith standard under the Tennessee Constitution and held that the proper inquiry is whether a trial conducted without the evidence would be fundamentally fair.

The analysis underlying this inquiry requires the court to determine first whether the state had a duty to preserve the evidence. If such a duty exists, the court must consider several factors bearing upon the consequences of the state's breach of its duty. These factors include (1) the degree of negligence involved, (2) the significance of the destroyed evidence in light of the existence of any substitute evidence, and (3) the sufficiency of the other evidence used to support the conviction. Id. at 917. We shall undertake this analysis in the present case. Also, a recounting of the evidence is necessary to determine whether the defendant received a fundamentally fair trial.

## I.

The defendant was convicted of the first degree felony murder of Dan Newland and the aggravated assault of Gary Dean Harris, the offenses occurring at the Next Door Tavern in the early morning hours of February 1, 1993. Mr. Harris, the victim of the aggravated assault and an acquaintance of the defendant, testified that on January 31, 1993, Super Bowl Sunday, he visited Big O's Tavern at approximately 3:00 p.m., where he drank beer, ate, and watched the football game. He stated that he saw the defendant at the tavern.

Mr. Harris testified that he left the first tavern and went to the Next Door

2

Tavern. He stated that the defendant arrived at some point in the evening. He said that he spoke to the defendant and that he did not believe that the defendant was intoxicated. According to Mr. Harris, the defendant did not have difficulty walking, and his speech was not slurred. Mr. Harris testified that he saw the defendant and Kevin Williams arm wrestling across the room. He said he had seen Mr. Williams but not the defendant arm wrestle at the Next Door Tavern on earlier occasions. Mr. Harris testified that he then saw the defendant and Mr. Williams fighting on the floor. Mr. Harris said he did not know how or why the fight started.

Mr. Harris testified that he and Dan Newland helped break up the fight. He said that after the fight, the defendant left the tavern. He stated that later, as he was inside the tavern walking away from the front door, he felt a piece of wood strike him in the back. Mr. Harris testified that he looked behind him and saw the door of the tavern open with someone standing in the doorway holding a gun. He said he saw Mr. Williams kick the door closed, heard a gunshot, and felt the gunshot hit him in the back. Mr. Harris testified that he then lost consciousness and did not remember anything until he awoke in the hospital.

Jack Speakman testified that he had known the defendant for several years. Mr. Speakman said that on January 31, 1993, at approximately 10:30 or 11:00 p.m., he and the defendant were shooting pool at the Next Door Tavern when the defendant wanted to arm wrestle. Mr. Speakman stated that he told the defendant that he did not want to arm wrestle but that he knew someone who would. He introduced the defendant to his friend, Kevin Williams, and the defendant and Mr. Williams agreed to arm wrestle. Mr. Speakman testified that he and another man whom he did not know bet money on the first match, which Mr. Williams won. Mr. Speakman stated that the defendant and Mr. Williams then agreed to a second match.

Mr. Speakman testified that before the second match began, the defendant grabbed Mr. Williams' hand, slapped it down on the bar, and picked up the money. Mr. Speakman said that as the defendant got up to leave, he put the defendant in a neck hold and threw him to the ground. He stated that Mr. Williams then grabbed the money from the defendant while the defendant was on the floor. He testified that

3

he was pulled off the defendant by his wife and others.

Mr. Speakman testified that the defendant got up and angrily walked out of the tavern. He said Keith Walker followed the defendant out of the tavern to talk to the defendant. Mr. Speakman testified that he also went outside the tavern after about fifteen to twenty seconds. He said the defendant entered his truck and was speaking to Mr. Walker through the truck window when he yelled at Mr. Speakman, "I'll be back to kill you, you S.O.B." Mr. Speakman said he heard the defendant say that he was going to go home to get a gun and kill everyone in the tavern. Mr. Speakman testified that he heard the defendant start the truck engine and that he told the defendant that he would not be at the tavern. He said he walked back inside and told his wife that it was time to leave, and the two of them left. He said they did not drive in the same direction as the defendant but rather took another direction to pick up his motorcycle at a friend's house.

Mr. Speakman testified that the defendant did not have difficulty walking or being coordinated as he was playing pool. He stated that the defendant was capable of hitting the ball. He said the defendant did not have difficulty speaking, and his speech was not slurred. Mr. Speakman testified that he did not believe the defendant was drunk. Mr. Speakman admitted that he yelled at the defendant while outside the tavern. He conceded that he had been drinking since the start of the football game and estimated that he drank seven or eight beers. He also testified that he did not believe that the defendant was more intoxicated than Mr. Newland or Mr. Harris.

Kevin Williams testified that he had known the defendant for several years before the night of the shooting and that he and the defendant had arm wrestled on previous occasions. He said there was nothing extraordinary about the first arm wrestling match until the defendant accused him of cheating. Mr. Williams testified that he offered to wrestle the defendant again, but before he could get in position, the defendant grabbed his hand, slammed it on the bar, grabbed the money wagered on the match, and walked toward the door. Mr. Williams stated that he saw Jack Speakman wrestle the defendant to the floor, causing the money the defendant was holding to fall to the floor. He said someone picked up the money and handed it to him.

4

Mr. Williams testified that the defendant then left the tavern.

Mr. Williams testified that about five to ten minutes after the defendant left, he saw Mr. Speakman walk outside. Mr. Williams said that shortly after the defendant left, Keith Walker said something to him that made him think that he should leave and go home, but he said he decided to stay at the bar. He said that about thirty to forty minutes after the defendant left the tavern, he saw the tavern door fly open, a portion of a long gun come in, and Dan Newland fall to the floor after a shot was fired. Mr. Williams testified that he went to the door, pushed the door closed, and attempted to grab the portion of the gun barrel sticking through the door. He said the gun was wrestled from his grasp, and a shot was fired through the door, missing him but striking Mr. Harris in the back. He said he told his wife to go out the back door, and he quickly followed her outside. Mr. Williams said that he and his wife went to Mr. Speakman's house. He said he could not identify the shooter because he only saw the shooter's arms and a portion of the gun.

Mr. Williams testified that the defendant did not have any difficulty walking, talking or moving around as they were arm wrestling. He also stated that the defendant's speech was not slurred. Mr. Williams conceded that on the night of the offense, he had been drinking for several hours while at a Super Bowl party and also at the tavern. He estimated that he had drunk nine beers. Mr. Williams stated that he did not believe that he was intoxicated. He testified that no one was "falling down drunk," including the defendant.

Martha Bryant, an employee of the Next Door Tavern, testified that she lived next to the tavern and that she was at the tavern on the night of the shooting. She said that although she was not scheduled to work that night, she was helping an employee clean tables. She said she saw the defendant and Kevin Williams arm wrestling, but she did not pay much attention until she saw Jack Speakman and the defendant on the floor surrounded by several people. She said she did not see anyone strike or hit the defendant. Ms. Bryant stated that she heard the defendant say, on his way out of the tavern, that he was going to get a gun and kill everyone. She said that the defendant appeared mad and upset but that she did not notice any injuries

5

sustained by the defendant. Ms. Bryant testified that she did not take the defendant's threat seriously, although she went home immediately after the defendant left the tavern at approximately 10:30 p.m.

Ms. Bryant testified that she returned to the tavern at about 11:15 p.m. She stated that she was dancing with Dan Newland when she saw a gun barrel through the door, heard two gunshots, and then saw Mr. Newland and Mr. Harris fall to the floor. She said that she was scared and told everyone to get down. Ms. Bryant stated that she checked on Mr. Newland and Mr. Harris and called 9-1-1. She testified that she then saw the defendant holding "a long-barreled gun . . ., like a shotgun." She said she did not see Beverly Hunter, the defendant's cousin, at the tavern that night.

Ms. Bryant testified that she believed the defendant had been drinking but that he was able to walk, and his speech was not slurred. In Ms. Bryant's opinion, the defendant did not at any time during the night of the offense act in a way to make her believe that he was not aware of his surroundings or unable to understand what was happening. Ms. Bryant conceded that she was not paying attention to everything that was going on because a big crowd was at the tavern that night.

Rita Williams, Kevin Williams' wife, testified that at the time of the shooting, she had known the defendant for five or six years. She said she went to the Next Door Tavern with her husband on the night of the shooting, and while at the tavern, she briefly spoke to the defendant. Ms. Williams stated that the defendant's speech was not slurred and that he did not have any difficulty talking. Ms. Williams testified that she was not drinking on the night of the offense.

Ms. Williams testified that she was sitting two tables away from the defendant and her husband when the arm wrestling match took place. She said that she was not paying much attention to the match but that she recalled seeing Jack Speakman throw the defendant to the floor and tell him to let go of the money. She stated that both she and Pam, Mr. Speakman's wife, tried to calm Mr. Speakman so he would release the defendant. Ms. Williams testified that after Mr. Speakman let go of the defendant, the defendant left the tavern. She said she did not notice any blood or

6

bruises on the defendant's face. She also stated that she did not hear the defendant say anything as he left.

Ms. Williams testified that approximately forty-five minutes after the defendant left, she saw the door to the tavern open and the defendant standing in the doorway with a shotgun. She said that she then heard a shot and saw Dan Newland fall to the floor. She stated that she dropped to the floor and heard a second shot. She recalled seeing someone else fall to the floor, and she testified that she then went out the back door where she met her husband. Ms. Williams stated that she and her husband drove to Mr. Speakman's house and told him about the shooting.

Ms. Williams testified that she saw the defendant drinking beer and playing pool that night. In her opinion, the defendant did not appear to have difficulty standing up or playing pool. Ms. Williams stated that she saw blood on the defendant's face when he returned to the tavern with the gun. She also testified that the defendant was friends with both of the victims. She said that the defendant opened the door and fired the shot and that he was looking at Mr. Newland when he shot the gun.

Keith Walker testified that he had known the defendant for several years. He said that he was at the Next Door Tavern on January 31, 1993, when the defendant and Mr. Williams were arm wrestling. Mr. Walker stated that he was shooting pool and not paying attention to the arm wrestling. He said that he heard a commotion, turned around, and saw Jack Speakman on top of the defendant. He testified that he saw several people surrounding the pair and that Mr. Speakman had to be pulled off the

defendant. Mr. Walker stated that the defendant walked outside the tavern and stated that he was going to get a gun and come back to the tavern.

Mr. Walker testified that he followed the defendant to try to calm him. He said that Mr. Speakman followed him out of the tavern, keeping a little distance behind him. He testified that he spoke to the defendant outside the tavern, and the defendant stated a couple of times that he was going to get his gun and come back and kill Mr. Speakman and Mr. Williams. Mr. Walker said the defendant entered his truck but

7

continued to talk to him through the window. He recalled that the defendant and Mr. Speakman exchanged words before the defendant drove away in his truck. Mr. Walker testified that the defendant did not appear to have any difficulty talking, walking, or driving his truck. He said the defendant lived about three miles from the tavern.

Mr. Walker testified that after the defendant drove away, he went inside the tavern and told Mr. Williams of the defendant's threat. Mr. Walker said that although he tried to convince him to leave, Mr. Williams stayed at the tavern. Mr. Walker said that about twenty to thirty minutes later, he heard a gunshot while he was sitting at a pool table. He said he saw the defendant standing in the doorway with a shotgun, and the defendant had blood dripping down one side of his face. Mr. Walker testified that the defendant then fired a second shot. He stated that he went out the back door and around the building to look for the defendant. He said that he saw the defendant near an outside corner of the tavern and that he tried to calm the defendant. Mr. Walker testified that the defendant pointed the shotgun at him but that when the defendant was distracted by someone else, he grabbed the shotgun from the defendant. Mr. Walker stated that the gun was a single-shot shotgun and that a single live shell was in the chamber.

Mr. Walker testified that after he took the shotgun from the defendant, the defendant told him there was no reason for him to be treated the way he had been treated in the tavern. Mr. Walker said he interpreted the defendant's statement to mean that the defendant should not have been embarrassed in that manner.

Herschell Jackson, a patron of the Next Door Tavern, testified that he was an acquaintance of the defendant and that he also knew Kevin Williams and Jack Speakman very well. He said he saw the defendant and Mr. Williams arm wrestling from the other end of the bar. He said he then saw several people walking towards the door yelling at each other. He said the defendant then left the bar.

Mr. Jackson testified that after about an hour, he heard what sounded like someone kicking open the door, and then he heard a gunshot. He said he looked toward the door and saw the defendant standing with a shotgun. Mr. Jackson stated

8

that he moved toward the door and tried to close it, but the defendant fired at least one more shot through the door. He testified that after the shooting, he saw Keith Walker come through the back door of the tavern with a shotgun.

Cheatham County Deputy Sheriff Roy Briscoe testified that he responded to a 9-1-1 call at 12:32 a.m. regarding an accident involving the defendant's truck on the Old Clarksville Highway approximately seven-tenths of one mile from the Next Door Tavern. He said the defendant's truck appeared to have run off the road, hit a barn, and turned end-over-end, landing in the yard of a residence. He stated that he did not observe any skid marks. Deputy Briscoe stated that the driver of the truck was not at the scene and that there were no eyewitnesses to the accident. He testified that while investigating the accident scene, he overheard a radio call for Metro Police to respond to a shooting at the Next Door Tavern. He said that he later received information that the defendant had been arrested in relation to the shooting, and he stated that he asked Metro Police to draw a blood sample from the defendant. Deputy Briscoe testified that he believed the defendant was driving under the influence of an intoxicant because there were numerous alcoholic beverage containers inside and outside the defendant's truck.

Michael Hooper, an emergency medical technician, testified that at 12:47 a.m., he and his partner responded to a call regarding a shooting at the Next Door Tavern. He said that as he was driving the ambulance on Clarksville Highway looking for the tavern, he saw the defendant staggering in the middle of the highway. He stated that when he asked the defendant what was wrong, the defendant said that he had wrecked his truck. He stated that the defendant had cuts and blood on his face. Mr. Hooper testified that he then saw another person approaching them, and by the time they put the defendant in the back of the ambulance, someone had reached the ambulance and told them about the shooting. Mr. Hooper said they then went to the tavern.

Mr. Hooper testified that when he first saw the defendant, the defendant was having a lot of difficulty walking and was not walking in a straight line. He said the defendant's injuries were consistent with those that would result from an automobile

9

accident. After reviewing photographs of the defendant's wrecked truck, Mr. Hooper said that he would have expected the defendant to have been killed or severely injured and would not have expected him to be able to stand and walk around. He also testified that the defendant appeared confused and had a loss of equilibrium, although he did not know whether the defendant was suffering from shock. He stated that he believed the defendant "could certainly understand" what the medical personnel were saying. Mr. Hooper explained that the defendant's difficulty walking and talking could have been caused by injuries sustained in the wreck or by being struck during a fight. He said he was unsure whether the defendant had experienced a loss of consciousness. Mr. Hooper testified that he believed that the defendant was intoxicated.

Officer William McCall of the Metro Police Department testified that he responded to a call at 12:51 a.m and that he was the first officer to arrive at the Next Door Tavern after the shooting. He said that the defendant was in an ambulance and that medical personnel were trying to administer treatment to the defendant, but he refused and tried to leave on two occasions. He stated that the defendant told him he had been in a fight. Officer McCall testified that the defendant did not slur his speech but appeared coherent and seemed to understand his questions. He said the defendant smelled like alcohol, although he said he did not believe the defendant was drunk. Officer McCall identified the single-action shotgun given to him by Herschell Jackson during investigation at the tavern.

Metro Police Officer Christine Woods testified that she was the second officer to arrive at the tavern after the shooting. She said that when she asked the defendant twice if he had shot anyone, the defendant responded each time by telling her that he had been involved in a wreck. She said she interpreted the defendant's statements as an indication that he did not want to talk about the shooting. She testified that in her opinion, the defendant was intoxicated but not disoriented or confused. She said the defendant seemed to understand what was happening around him. Officer Woods conceded that she described the defendant as being very intoxicated in her report.

10

Metro Police Detective David Miller testified that he assisted Detective Al Gray in the investigation. He testified that on the night of the incident, he interviewed the defendant at the hospital. He said that the defendant appeared to have been drinking but that during the interview, the defendant did not slur his speech, appeared coherent, and seemed capable of understanding what was going on around him. He said the defendant gave specific answers to his questions. He testified that the defendant told him during the interview that he had been in a fight after an arm wrestling match and that he was trying to get away when he wrecked his truck. Detective Miller said he requested that a blood sample be drawn from the defendant after receiving a request from Deputy Briscoe for purposes of Briscoe's investigation of the defendant for driving under the influence.

Metro Police Detective Alfred Gray, III, testified that he interviewed the defendant at approximately 4:00 a.m., three to three and one-half hours after the shooting. He said the defendant appeared to understand his constitutional rights and did not appear to be intoxicated. He said he learned during his investigation that the defendant had obtained the shotgun from his home. Detective Gray testified that he investigated the loss of the defendant's blood sample but was not able to determine what happened to it.

Dr. Edmund Rutherford, the trauma surgeon who treated Mr. Harris, testified that a shotgun wound can be life threatening if made at close range, even if the shotgun pellets traveled through a door. He testified that despite Mr. Harris' blood alcohol content being .286 the night of the shooting, he found that Mr. Harris was alert and coherent. He said that the degree of impairment for a specific blood alcohol content would be greater for persons who did not chronically use alcohol.

Dr. Julia Goodin, the Davidson County Medical Examiner, testified that Dan Newland received shotgun wounds to the left arm and upper chest and that they resulted in his death. She testified that the shotgun was fired from a distance of between eight to twenty feet. Dr. Goodin also testified that Dan Newland had a blood alcohol level of .31 percent.

11

Beverly Hunter, the defendant's cousin, testified that she, the defendant, Mr. Harris, and another person were at the VFW drinking the afternoon of the shooting. She testified that she believed the defendant was drunk because he spilled his drink at the VFW. She said that after two or three hours of drinking, they went to another bar for about an hour, and then they went to the Next Door Tavern. Ms. Hunter testified that she was using the pay telephone on the outside wall near the Next Door Tavern door when she saw the defendant leave the tavern followed by Jack Speakman and another person. She testified that she did not notice any arguing or yelling between the defendant and anyone else. Ms. Hunter conceded that she drank a lot that night. She described the defendant as being drunk but not "falling down drunk." She said the defendant was coherent, was able to carry on a conversation, and did not stumble or fall.

## II.

The defendant contends that the trial court should have dismissed the indictment because the state failed to preserve the blood sample taken from him on the evening of the shooting. He argues that he was precluded from offering scientific evidence that most likely would have established that he was intoxicated at the time of the offense. He asserts that had he had access to the blood sample for testing, the jury would have returned a verdict of voluntary manslaughter or, at most, second degree murder.

The state concedes that evidence of the defendant's intoxication would have been relevant to negate the specific intent required for the charges of first degree, premeditated and deliberate murder and for attempted first degree murder, the underlying felony for the felony murder charge. However, it claims that the evidence is not materially exculpatory because the blood sample would have, at best, shown the defendant's blood alcohol level. It argues that such evidence would not have negated the requisite culpable mental state because proof of intoxication alone is not a defense to a specific intent crime. That is, the state argues that proving the blood alcohol level of the defendant at the time of the killing would not be sufficient to negate the requisite specific intent without other evidence that the defendant's intoxication deprived him of

12

the mental capacity to form the specific intent required for the offenses charged.

At the pretrial hearing on the defendant's motion to dismiss, Detective Miller from the Metro Police Department testified that on February 1, 1993, Deputy Briscoe asked him to have a blood sample drawn from the defendant. Detective Miller said that drawing blood was not normally done in homicide cases but that Deputy Briscoe needed a blood sample for his investigation of the defendant for D.U.I. with respect to the truck accident. Detective Miller said that after he received the blood sample from the hospital, he gave the sample to Detective Gray, who was in charge of investigating the shooting. Detective Gray testified that he did not remember receiving the blood sample from Detective Miller but that he remembered finding the blood sample in the homicide section refrigerator and taking it to the property room in July 1993.

Officer Joy Moore of the Metro Police Department Property Room testified regarding the handling of blood samples. She testified that according to her records, a blood alcohol kit containing the defendant's blood sample was delivered to the property room on July 14, 1993, by Detective Gray. She said her records show that the blood sample was logged, and she stated that the normal procedure would be to place the sample in the cooler until it could be transported to the Tennessee Bureau of Investigation (T.B.I.) Crime Laboratory. Officer Moore testified that her records show that she transported the defendant's blood sample to the T.B.I. lab on July 27, 1993, and gave it to Mildred Krice.

Mildred Krice, an evidence technician at the T.B.I. Crime Laboratory, testified that her records show that the lab never received the defendant's blood sample. She said that samples are delivered in a sealed box with an evidence submittal form inside the sealed box. She stated that when she receives a blood sample, she opens the sealed box, verifies that the blood sample is identified as shown on the evidence submittal form, enters the data into the computer, and finally attaches a T.B.I. Crime Laboratory label to the sample. She said that if the form is missing or the sample identification does not match the form information, her procedure is to notify the delivering agency for a correction.

13

Terry Fields of the T.B.I. Forensic Division testified that blood alcohol analysis is generally conducted within about one week of its arrival at the lab. He said that blood samples that have been through the proper chain of custody requirements may be tested and may render accurate results for a long time, possibly years, after the blood sample is taken. Mr. Fields conceded that a person's intoxication level alone does not determine whether he or she is able to function, to think clearly, or to form the intent required to commit murder.

The trial court denied the defendant's motion, finding that "this was an accidental loss, a negligent loss, a careless loss or something, but it was not in bad faith." The trial court also indicated that the fact that the request for the sample came from a Cheatham County deputy investigating the wreck of the defendant's truck, not from the investigating detectives who thought the sample was not needed, had some bearing on the issue. Finally, the trial court determined that other evidence existed in the case to support the defendant's defense relative to intoxication.

**III.**

Initially, we note that voluntary intoxication is not a defense to prosecution and conviction for the commission of an offense. Tenn. Code Ann. § 39-11-503(a). However, evidence of intoxication, voluntary or not, is admissible if it is relevant to negate the requisite culpable mental state. Id.

The defendant was charged with felony murder, specifically, the reckless killing of Danny Newland during the attempt to perpetrate first degree murder. See Tenn. Code Ann. § 39-13-202(a)(2) (repealed 1995). He was charged with the attempted intentional, premeditated, and deliberate first degree murder of Gary Dean Harris. He was also charged with aggravated assault, specifically, the intentional, knowing, or reckless causing of bodily injury to Mr. Harris by use of a deadly weapon. See Tenn. Code Ann. § 39-13-101(a)(1), -102(a). The state concedes that evidence of the defendant's intoxication would be relevant to the attempted first degree murder underlying the felony murder charge and the premeditated first degree murder charge. We must now determine, pursuant to our supreme court's guidance in Ferguson, whether the defendant received a fundamentally fair trial.

14

Pursuant to Ferguson, we first determine whether the state had a duty to preserve the defendant's blood sample. We believe that it did. As previously discussed, the defendant's level of intoxication would have been material in preparing a defense to the extent that a high blood alcohol level would have helped show that the defendant could not have formed the requisite intent. We note that in denying the defendant's motion, the trial court considered it significant that the detectives investigating the murder and assault charges did not request the sample; rather it was requested by the Cheatham County deputy investigating a possible D.U.I. charge. However, although the Davidson County detectives may not have had a duty to collect the evidence, once they had done so at the request of the Cheatham County deputy, they had a duty to preserve the evidence they collected because it "might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2533-34 (1984). Having determined that the state breached its duty by losing the blood sample, we must now determine the consequences of the state's breach.

Pursuant to Ferguson, the first factor to be considered relates to the degree of negligence involved. We note that the court in Ferguson stated that this factor "presumes negligence in the loss or destruction of the evidence. Should the proof show bad faith, the trial judge may consider such action as may be necessary to protect the defendant's fair trial rights." Ferguson, 2 S.W.3d at 916 n.10. The record in the present case shows that the blood sample was accounted for until it was to have been delivered to Mildred Krice at the T.B.I. crime lab. The evidence was either never delivered to Ms. Krice or was lost once it reached the crime lab. Nothing in the record suggests that the evidence was intentionally or recklessly lost or destroyed. Thus, the conduct amounts to simple negligence.

The second factor is the significance of the missing evidence. Had the blood sample revealed a particularly high level of alcohol, it could have bolstered the

defendant's argument that he was too intoxicated to form the requisite intent. In this respect, the missing evidence was of some significance.

15

On the other hand, the significance is diminished by testimony from nearly every witness that although the defendant had been drinking and was intoxicated, he was coherent, in control of his motor skills, and aware of his surroundings. Several witnesses testified that the defendant was not "falling down" drunk. Dr. Rutherford, who treated Mr. Harris, testified that Mr. Harris was alert and coherent despite a blood alcohol level of .286. Dr. Rutherford indicated that the degree of impairment for a specific blood alcohol level would depend on one's tolerance. In addition, Terry Fields testified that one's intoxication level alone does not determine their ability to function or think clearly. This evidence diminishes the significance of the missing evidence.

The third factor to consider is the sufficiency of the convicting evidence. No doubt exists that the defendant was the shooter. The evidence showed that the defendant, angry over an arm wrestling match, threatened to get his gun and shoot everyone in the tavern. The defendant then followed through on his threat by driving to his home, getting his gun, driving back to the tavern thirty to forty minutes after making the threat, opening the door and shooting. The evidence shows that the defendant was alert and coherent enough to formulate a plan of revenge and carry out that plan. The evidence was sufficient as a matter of law.

Considering the foregoing factors, we do not believe that the fact that the blood sample was missing denied the defendant a fundamentally fair trial or requires a new trial with special instructions to the jury as suggested in Ferguson. No evidence exists that the state's loss of the evidence was intentional, the missing evidence is of

little significance in light of other evidence of the defendant's level of intoxication, and the convicting evidence is sufficient.

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

16

_____
David G. Hayes, Judge


(Not Participating)_____
Jerry Scott, Special Judge