[Cite as *State v. Rios*, 2012-Ohio-3289.]

### IN THE COURT OF APPEALS OF CLARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 10CA0099 |
| vs. | : | T.C. CASE NO. 08CR523 |
| JUAN RIOS | : | (Criminal Appeal from Common Pleas Court) |
| Defendant-Appellant | : | |

. . . . . . . . .

### O P I N I O N

**Rendered on the 20th day of July, 2012.**

. . . . . . . . .

**Andrew Wilson, Pros. Attorney; Lisa M. Fannin, Asst. Pros. Attorney, Atty. Reg. No. 0082337, 50 E. Columbia Street, 4th Floor, P.O. Box 1608, Springfield, OH 45501**
        **Attorneys for Plaintiff-Appellee**

**Linda Joanne Cushman, Atty. Reg. No. 0043543, 150 N. Limestone Street, Suite 206, Springfield, OH 45502**
        **Attorney for Defendant-Appellant**

. . . . . . . . .

**GRADY, P.J.:**

### I. Introduction

{¶ 1} Defendant Juan Rios appeals from his conviction and sentence for the aggravated murders of Misael Nunez and Arnulfo Claudio. On appeal, Rios raises three assignments of error concerning the consumptive testing of DNA evidence and challenging

the sufficiency and manifest weight of the evidence presented at trial. For the reasons set forth below, we overrule the three assignments of error and will affirm Defendant's conviction and sentence.

## A. Statement of Facts

{¶ 2}  The State's evidence at trial demonstrated the following facts:

{¶ 3}  On June 21, 2008, Defendant and two of his friends, Chad Adkins and Mike Simms, spent the early evening using cocaine and drinking beer with several other people. Later that night Defendant suggested going to Club Lavaca in Springfield, Ohio, so that the three men could rob people. Adkins and Simms agreed.

{¶ 4}  The three men were in and out of the club that night. They spent much of the night standing in the parking lot, drinking beer and socializing. They spoke with various people, including Tanya Algren and Kelsey Woerlein. Defendant asked the two women to lure people out of the club so that the men could rob them at gunpoint. He threatened to kill the women when they refused. Algren and Woerlein eventually went into the club, but they never brought anyone out for the three men to rob.

{¶ 5}  In the meantime, Arnulfo Claudio and his friend Octavia Reyas arrived at the club, in the company of several other men. Soon after arriving, they encountered Claudio's cousin Misael Nunez inside the club.

{¶ 6}  Near closing time early the following morning, Reyas was leaning against the wall outside the men's restroom, talking with Claudio and a few other men when he saw Nunez and Defendant go into the restroom. Reyas believed that they were the only people in the restroom. A couple of minutes later, Reyas heard a commotion inside the restroom and

told Claudio that it sounded like fighting. Claudio tried to open the door, but it was locked, so he kicked it open and entered the restroom. Reyas immediately heard a gunshot and saw Claudio fall to the ground.

{¶ 7} Nunez ran out of the restroom, followed by Defendant, who was brandishing a gun. In addition to Reyas, numerous patrons and employees saw Defendant shoot Nunez in the back. Many of those witnesses had known Rios to one degree or another, prior to the shootings. None of the witnesses saw Simms or Adkins in the area of the restroom or near Nunez at the time of the shootings.

{¶ 8} Nunez fell to the ground, and one witness saw him trying to crawl away from Defendant, who stood over Nunez and shot him again. Defendant rifled through Nunez's pockets and pulled a chain from around his neck before shooting Nunez again and then leaving the club.

{¶ 9} A club employee called 911. When the police arrived, witnesses provided them with Defendant's name and description. At least one witness told the officers where she believed Defendant could be found. A short time later, Defendant was found hiding in an upstairs closet of a friend's home.

{¶ 10} Nunez and Claudio were transported to the hospital. Nunez was pronounced dead shortly after his arrival. Claudio was care flighted to another hospital, where he died several days later. The coroner testified that the cause of Nunez's death was multiple gunshot wounds, and that Claudio was killed by a single gunshot wound to the head.

{¶ 11} Later that morning, a local parishioner found a gun in the bushes of his church parking lot, near Club Lavaca. He gave the gun to his pastor, who turned it over to the

police. The gun was found to have been stolen from a home in Springfield. Ballistics testing conducted at the Bureau of Criminal Investigation (BCI) demonstrated that it was the same gun that was used to kill both Nunez and Claudio.

{¶ 12} Forensic testing at BCI discovered the presence of both Nunez and Claudio's DNA on the gun, as well as on the pants Defendant was wearing at the time of his arrest. Swabs taken of Defendant's hands at the time of his arrest were highly indicative of gun shot residue.

{¶ 13} The case was assigned to Detective Hicks, who interviewed Defendant and Adkins. Defendant claimed to have had no involvement with the shooting. Detective Hicks was unable to interview Simms, who had moved to Louisiana after the murders. Defendant told a very different version of events during an interview with a local news station, insisting that he was the victim of a drug deal gone wrong.

{¶ 14} In support of a charge of having weapons under disability, the State called to the stand a Clark County Clerk of Courts employee, who testified that Defendant had a prior felony conviction for possession of cocaine in case number 04-CR-437. He testified that there was no evidence in the court's records that Defendant's right to bear arms had been restored and his disability was still in place.

## B. Procedural History

{¶ 15} On June 30, 2008, Defendant was indicted on fourteen counts: four counts of aggravated murder, R.C. 2903.01(B); two counts of murder, R.C. 2903.02(A); four counts of felony murder, R.C. 2903.02(B); two counts of aggravated robbery, R.C. 2911.01(A)(1); one count of having weapons under disability, R.C.2923.13(A)(3); and one count of tampering

with evidence, R.C. 2921.12(A)(1). Each of the aggravated murder charges included three specifications. The murder, felony murder, and aggravated robbery charges each included one specification.

{¶ 16} Numerous pre-trial motions were filed, but the only one relevant to Defendant's appeal is a July 2008 motion he filed expressing a concern that DNA samples recovered from the murder weapon would likely be consumed by any DNA testing. Defendant sought the appointment of an expert witness and requested his expert's presence during testing of any DNA evidence at BCI.

{¶ 17} Judge O'Neill granted Defendant's request to appoint an expert witness. Because BCI protocol does not allow for the presence of non-employees in the labs during testing, the court ordered the State to transfer all evidence of presumptive blood samples to a private testing facility to enable Defendant's expert to be present during its testing.

{¶ 18} A few months later, the case was transferred to Judge Rastatter. The State filed a motion asking the court to reconsider Judge O'Neill's ruling that required any DNA testing to be conducted at an outside lab, because it would put an undue financial burden on the State. Defendant promptly objected. The trial court held a hearing, during which the State offered to transfer the samples to a lab of Defendant's choice for his expert to perform the testing. Defendant declined, insisting that he had never asked for the evidence to be tested in the first place. The trial court granted the State's motion, and the DNA testing was performed at the BCI laboratories.

{¶ 19} The case proceeded to trial in September 2010, and a jury convicted Defendant of all counts and specifications. At the conclusion of the sentencing phase, the jury found,

beyond a reasonable doubt, that the aggravating circumstances of which Defendant was found guilty did not outweigh the mitigating factors and recommended a life sentence without the possibility of parole.

{¶ 20} The parties agreed that the two counts of aggravated murder, one count of murder, and two counts of felony murder with regard to the death of each of Defendant's two victims would merge for sentencing. The parties also agreed that the two aggravated robbery convictions merged. The trial court sentenced Defendant to life in prison without the possibility of parole for the aggravated murder of each victim, ten years for aggravated robbery, five years for having weapons under disability, five years for tampering with evidence, and three years for the firearm specifications. All sentences were ordered to be served consecutively.

{¶ 21} Defendant filed a timely notice of appeal and has raised three assignments of error.

## II. Legal Analysis

{¶ 22} Defendant's first assignment of error:

"THE CONSUMPTIVE TESTING OF EXCULPATORY DNA SAMPLES WITHOUT THE PRESENCE OF APPELLANT'S EXPERT WAS A VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS."

{¶ 23} The consumptive testing **of evidence violates a defendant's due process rights only when the evidence possesses an exculpatory value that was apparent before the evidence was destroyed.** *California v. Trombetta,* **467 U.S. 479, 488-489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).**

**{¶ 24}** Defendant does not identify what exculpatory value the DNA samples recovered from the murder weapon was apparent before the samples were tested. Despite his suggestion to the contrary, the fact that Defendant requested that his expert be present during the testing does not demonstrate that the evidence necessarily had any exculpatory value. Moreover, we find nothing in the record from which the trial court could or should have found that the DNA evidence had any exculpatory value that was evident prior to BCI's testing.

**{¶ 25}** Defendant's first assignment of error is overruled.

**{¶ 26}** Defendant's second assignment of error:

"THE GUILTY VERDICTS ON ALL COUNTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶ 27}** A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Hufnagle,* 2d Dist. Montgomery No. 15563, 1996 WL 501470 (Sept. 6, 1996). The proper test to apply to that inquiry is the one set forth in *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983):

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accord, *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶ 28}   The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve.   *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).   In *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997), we observed:

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

{¶ 29}   This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict.   *State v. Bradley,* 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 30}   The primary thrust of Defendant's argument is that his convictions for the murders of Nunez and Claudio were against the manifest weight of the evidence because none of the State's witnesses were credible.   However, every instance of "inconsistencies, contradictions, and falsifications" to which he refers involved an issue of witness credibility for the jury to weigh in returning a verdict.   Moreover, the alleged inconsistencies seem to relate to peripheral matters that occurred prior to the shootings.

{¶ 31}   Although nobody witnessed Defendant shoot Claudio, there was credible

circumstantial evidence that he did so. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks,* 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991).

{¶ 32} Reyas testified that he believed that only Defendant and Nunez were in the restroom when Claudio entered. Almost immediately, Reyas heard a gunshot and saw Claudio fall to the floor. Reyas and multiple other eyewitnesses testified that right after they heard what sounded like a gunshot or firecracker coming from the restroom, they saw Defendant chase Nunez out of the restroom, with a gun in his hand. And, they saw Defendant shoot Nunez several times. Their testimony is not fatally undermined by the matters Defendant cites.

{¶ 33} Defendant also argues that, had the State obtained a sample of Simms' DNA, Simms might have been identified as a contributor of the DNA that was found on the murder weapon. This is possible, since Woerlein testified that Simms showed her the guns in Defendant's car a few hours before the shootings. However, not a single witness placed a gun in Simms' hands near the time of the shootings, nor did any of the witnesses see Simms near the restroom or near Nunez at the time of the murders.

{¶ 34} In any event, the failure to obtain a sample of Simms' DNA for testing is not chargeable to the State. It was Defendant's burden to request that a sample of Simms' DNA be obtained and tested, in order for the Defendant to now complain that was not done.

{¶ 35} For the foregoing reasons, we conclude that the jury did not lose its way in finding Defendant guilty of the murders of Nunez and Claudio.

{¶ 36} Defendant's second assignment of error is overruled.

{¶ 37} Defendant's third assignment of error:

"THE GUILTY VERDICTS ON COUNTS 1, 2, 6, 7, 11, AND 12 WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE."

{¶ 38} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259:

{¶ 39} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶ 40} Defendant argues that his convictions for aggravated murder and aggravated robbery were not supported by sufficient evidence because the State failed to prove that he committed a theft offense. In support, he points to the fact that both victims were later found to have money in their possession.

{¶ 41} The State offered evidence from several witnesses, all of whom saw Defendant shoot Nunez and then go through his pockets. Reyas thought Defendant removed something from Nunez's pockets, although he could not see what. Reyas also saw Defendant remove a chain from around Nunez's neck. Even if the jurors determined that Defendant took nothing

from Nunez, they could have found that the evidence that Defendant rifled through Nunez's pockets was sufficient to prove that he attempted to commit a theft offense.

{¶ 42} Accordingly, we conclude that there was sufficient evidence to prove that Defendant committed or attempted to commit a theft offense in connection with the shootings, for purposes of aggravated murder and aggravated robbery. Moreover, that proof is reinforced by Defendant's prior statements to Simms, Woerlein, and Algren that he intended to rob people, which was admissible per Evid.R. 404(B) as proof of his intent to commit theft offenses.

{¶ 43} Defendant's third assignment of error is overruled. The judgment of the trial court will be affirmed.

FROELICH, J., And HALL, J., concur.

Copies mailed to:

Lisa M. Fannin, Esq.
Linda Joanne Cushman, Esq.
Hon. Douglas M. Rastatter