[Cite as *State v. Murphy*, 2022-Ohio-4555.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JENNIFER JO MURPHY NKA,
JENNIFER JO BARRY

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 21 BE 0042

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 20 CR 145

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor, *Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, 52160 National Road, St. Clairsville, Ohio 43950 for Plaintiff-Appellee and

*Atty. Katherine E. Rudzik*, 26 Market Street #904, Youngstown, Ohio 44503 for Defendant-Appellant.

Dated:  December 15, 2022

_____

**Robb, J.**

{¶1}  Defendant-Appellant Jennifer Jo Murphy (nka Jennifer Jo Barry) appeals after being convicted by a jury in the Belmont County Common Pleas Court.  She raises arguments on the sufficiency of the evidence, the weight of the evidence, the consumption of a portion of evidence during the recovery of touch DNA, and the effectiveness of defense counsel.  For the following reasons, Appellant's conviction is affirmed.

STATEMENT OF THE CASE

{¶2}  On September 30, 2020, Appellant was indicted for illegal conveyance of drugs of abuse onto the grounds of a specified government facility (a detention facility), a third-degree felony in violation of R.C. 2921.36(A)(2), (G)(2).  At the jury trial, a corrections officer from the jail in Belmont County testified about viewing a piece of mail addressed to inmate John Barry, which was opened during the standard inmate mail prescreening on November 22, 2019.  The envelope was blue with a Pittsburgh postmark.  A greeting card within the envelope contained a white powdered substance, which was discovered between the glued layers of the double-folded construction of the card.  The card was signed, "Love ya" with a symbol appearing to be an arrow pointing to the location of the substance.  (Tr. 218-228).

{¶3}  Testing by the State of Ohio's Bureau of Criminal Investigation (BCI) identified the substance as .33 grams of methamphetamine; a stipulation was entered as to this fact as well as the status of the substance as a drug of abuse.  (Tr. 3, 250-251).  BCI also sequentially tested the two most likely parts of the envelope to have retained touch DNA.  First, BCI tested the envelope flap, which had been torn open by the corrections officer during prescreening pursuant to protocol; however, the recovered DNA was insufficient for comparison.  Thereafter, BCI analyzed the stamp edges and found female DNA sufficient for comparison.  (Tr. 222, 252-254, 354).

{¶4}  An investigating sergeant from the Belmont County Sheriff's Department listened to Mr. Barry's recorded jail calls from the days before the substance in the card arrived at the jail.  Four days before the card's arrival, Mr. Barry had a "phone sex conversation" on a video call with Appellant, who was his wife.  (Tr. 255, 264-265).  When

Case No. 21 BE 0042

Mr. Barry voiced he hoped to receive mail soon, Appellant said he should be receiving something soon. (Tr. 256). An audio clip of this portion of the call was played for the jury. (Tr. 261).

{¶5} With the foregoing evidence, the sergeant obtained a search warrant for Appellant's DNA. While the sergeant was collecting the sample, Appellant suggested the name of a woman as someone the police should investigate as a person of interest in the illegal conveyance. However, the sergeant learned this woman was incarcerated in West Virginia from November 15, 2019 through the date of the offense, and she began her incarceration in that state after being extradited from the jail in Belmont County. (Tr. 267-268).

{¶6} After receiving Appellant's DNA sample, BCI concluded the DNA recovered from the edges of the stamp was consistent with Appellant's profile with the estimated frequency of occurrence rarer than one in 400,000 unrelated individuals. (Tr. 363, 366). The BCI scientist recovered a partial profile, which she said was typical for touch DNA such as that left on a non-licking stamp. (Tr. 360). She explained how she found data at seven locations out of 20 (plus the locations showing the sex of the source as female). (Tr. 359). Five of the seven locations were of sufficient quality for computing a statistic. (Tr. 364-365). The BCI scientist explained the testing sites on evidentiary items are chosen based on their likelihood of preserving touch DNA, which is why she tested the sticky envelope flap and then the sticky stamp edges. (Tr. 375-376).

{¶7} An independent DNA analyst utilized at the request of the defense was instructed to test the envelope flap and the stamp. Combining 18 new cuttings from the flap, the defense expert recovered a "partial mixed DNA profile" of insufficient quality for comparison. (Tr. 408). Her testimony indicated a male profile was also part of the mix. (Tr. 410-412, 417). The stamp already had the edges cut away and consumed during the testing performed by BCI. The defense expert cut four new edges from the remaining stamp for testing, but the "partial DNA profile" recovered from the stamp was of insufficient quality for comparison. (Tr. 409).

{¶8} The defense expert agreed it was to be expected the initial testing would consume the sample tested and make it unusable; she expressed there was no basis to believe the BCI test was inaccurate and had no criticism of BCI's technique. (Tr. 418, 420). She noted there is no guarantee DNA can be recovered from the same item already

tested, as there is no way to know where on the item certain DNA may be located. (Tr. 409-410). She also noted it was not unusual to see a match frequency of one in a quadrillion when a full profile of sufficient quality is recovered. (Tr. 413).

{¶9} Appellant's incarcerated husband testified by video. He said their discussion about mail in the recorded jail call was a reference to divorce papers he believed Appellant would be sending because they were not getting along. (Tr. 275). He also noted Appellant had been sending him legal mail related to charges pending against him in Pennsylvania. (Tr. 276).

{¶10} Mr. Barry said he was a drug addict and disclosed he had an extramarital relationship with a former girlfriend. (Tr. 278). He described his girlfriend as his "drug whore" and said she did as he instructed. (Tr. 279). Mr. Barry testified his girlfriend had been sending him methamphetamine or strips of Suboxone on the backs of greeting cards while he was in the Belmont County Jail. (Tr. 279-280).

{¶11} He then said his girlfriend died of an overdose two or three years earlier. (Tr. 285). When it was pointed out even two years ago would predate the offense at issue, Mr. Barry changed his estimate by saying his girlfriend died while he was in prison, stating this was after his stint in the jail in Belmont County (where he received the card at issue). (Tr. 287-288). The sergeant heard no jail calls between Mr. Barry and this female, and he was never informed about her potential as a suspect. (Tr. 300). Mr. Barry acknowledged he lied when he told investigators he did not receive drugs in jail and did not know who sent them. (Tr. 298).

{¶12} Mr. Barry also testified Appellant allowed various people to live in their house while he was incarcerated, including Mr. Barry's "drug whore" and men (whose presence he was against). (Tr. 280-282, 295). He named these individuals, acknowledging they were not Appellant's blood relatives. (Tr. 280-281, 292-293). In emphasizing the accessible supply of stamps in their house, he also disclosed "[Appellant] always writes to me, sending me * * * greeting cards and I-love-you cards and things of the such." (Tr. 283).

{¶13} The jury found Appellant guilty as charged, and the court sentenced her to 36 months in prison. The within timely appeal followed.

ASSIGNMENT OF ERROR ONE: SUFFICIENCY

{¶14} Appellant sets forth four assignments of error, the first of which contends:

Case No. 21 BE 0042

"THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION."

{¶15} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶16} In reviewing the sufficiency of the evidence, the court views the evidence and reasonable inferences in the light most favorable to the prosecution to ascertain whether any rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). *See also State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999) (reasonable inferences are viewed in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (all of the evidence is to be considered in the light most favorable to the prosecution, including reasonable inferences).

{¶17} The elements required for Appellant's conviction are knowingly conveying or attempting to convey a drug of abuse onto the grounds of a detention facility. R.C. 2921.36(A)(2). Appellant contests her identity as the sender of the methamphetamine. She argues the mere demonstration that she touched the stamp on the envelope did not prove she knowingly participated in sending the drugs.

{¶18} Appellant was the wife of the inmate who was the intended recipient of the methamphetamine hidden in a greeting card. The card was signed "Love ya" with an arrow apparently pointing to where the drugs were hidden in the card. Touch DNA was recovered from the edges of the stamp, which was consistent with Appellant's DNA and estimated to occur with a frequency of one in 400,000 unrelated individuals. Moreover, four days before the jail screened the envelope, Appellant spoke to Mr. Barry on a recorded video jail call (wherein they essentially displayed their continued feelings for each other via their participation in "phone sex"). Mr. Barry voiced his anticipation of receiving mail from Appellant, and she indicated he would be receiving something in the

mail soon. We also note when confronted by the investigating sergeant, Appellant blamed a woman who had a confirmed alibi of incarceration.

**{¶19}** Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Intent may be inferred from the circumstances surrounding the crime, including the defendant's conduct before, during, and after the offense. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). For a sufficiency review, the question is merely whether "any" rational trier of fact could have found the contested elements proven beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson*, 443 U.S. at 319. Viewing the evidence and rational inferences in the light most favorable to the state, a rational juror could conclude Appellant knowingly sent the drugs to her husband in jail. This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: WEIGHT

**{¶20}** Appellant's second assignment of error alleges:

"THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶21}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. Although the effect of the evidence in inducing belief is evaluated, weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review). When a defendant claims a conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

**{¶22}** Where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order

Case No. 21 BE 0042

to preserve the jury's primary function of weighing the evidence. *Thompkins*, 78 Ohio St.3d at 389.

{¶23} Appellant argues the verdict is against the manifest weight of the evidence because the only evidence linking her to the drugs is the DNA on the stamp. She characterizes this link as weak, noting her husband testified Appellant was living in a house with various people who could have obtained a stamp from her without her knowing why they wanted a stamp. She also states the DNA evidence was not strong because it was a partial profile and the odds of it matching another person were one in 400,000 unrelated individuals. She also points to the additional but insufficient male profile found by the defense expert in testing the envelope flap.

{¶24} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The testimony of Appellant's husband about people moving in and out of their house while he was incarcerated was hearsay (as he was not present) and could be viewed as lacking in credibility based on the jury's evaluation of him or his source. The jury could also find Appellant's husband was untruthful when he claimed he had been receiving methamphetamine in jail from his "drug whore" and not from Appellant. He claimed this woman stayed with Appellant while he was incarcerated even though he was having an extramarital affair with her.

{¶25} Likewise, the jury could find Appellant's husband was not credible in stating he was speaking about divorce papers when they were discussing the mail she had recently sent him. As the state points out, they engaged in "phone sex" during this same recorded jailhouse conversation. The jury had the best vantage point from which to judge his general and specific credibility by observing gestures, voice inflection, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jury heard the tone used by Appellant and her husband in discussing the mail she sent him, in a conversation that occurred four days before the drugs were discovered in the card addressed to Appellant and signed "Love ya." Appellant's husband also happened to mention Appellant regularly sent him greeting cards and "I-love-you cards" while he was incarcerated.

**{¶26}** Furthermore, the jury heard the testimony regarding the DNA results, and they occupied the best position from which to weigh the importance of the estimated frequency of occurrence based on the partial female DNA profile found on the edges of the stamp, which was consistent with Appellant's DNA profile. Appellant's husband acknowledged his "drug whore" and others living in the household were not related to Appellant (with regard to the statistic referring to the odds of a match among unrelated individuals). As to her other concern, the defense expert confirmed it was not uncommon for a subsequent analyst to be unable to find the same touch DNA on an item after it was tested, as it is difficult to predict where touch DNA may be recovered and the parts consumed during the test cannot be retested.

**{¶27}** "When more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury." *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). A thorough review of the record does not indicate this is the "exceptional" case in which the evidence weighs "heavily" against the conviction and requires the exercise of our limited "thirteenth juror" discretion to grant a new trial. *See Lang*, 129 Ohio St.3d 512 at ¶ 220. Accordingly, the decision to convict Appellant of illegal conveyance of drugs of abuse onto the grounds of a detention facility was not contrary to the manifest weight of the evidence. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE: EVIDENCE PRESERVATION

**{¶28}** Appellant's third assignment of error claims:

"DEFENDANT WAS DENIED HER * * * CONSTITUTIONAL RIGHTS OF DUE PROCESS." (Repeat of "rights" removed.)

**{¶29}** A state violates a defendant's due process rights if it "withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012), citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A *Brady* violation occurs if: (1) the state withheld evidence (either willfully or inadvertently); (2) the evidence is favorable to the accused (whether tending to exculpate or impeach); and (3) the evidence is material under the standard prejudice test, which asks whether there is a

reasonable probability the result would have been different if the evidence was disclosed to the defense. *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 81 L.Ed.2d 413, 104 S.Ct. 2528 (1984)

**{¶30}** Where it is merely argued the evidence the state failed to preserve was "potentially useful" because it "could have been subjected to tests, the results of which might have exonerated the defendant," the defendant must show a bad faith failure to preserve the evidence. *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In this context, the term bad faith requires more than mere bad judgment or negligence; it generally involves situations where there is dishonest purpose, conscious wrongdoing, or actual intent to mislead. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 81

**{¶31}** Appellant argues the state failed to provide her with access to all meaningful evidence in the state's possession in violation of these principles. Initially, Appellant claims the use of all four edges of the stamp during testing constituted the destruction of evidence and this protocol deprived her of the ability to independently verify the results obtained by BCI. Appellant argues the "spoiled" evidence was materially exculpatory because BCI only recovered a partial profile but the independent lab may have been able to recover a full profile, which may have exonerated Appellant.[1] Alternatively, Appellant says if the evidence was only potentially useful, then the state's bad faith was evident. She postulates the remainder of the stamp may have been tainted when the state sent it

---

[1] Appellant acknowledges the burden is typically on the defendant but suggests we employ an exception adopted by some appellate courts. That is, she claims the state had the burden to show the evidence had no exculpatory value because it was destroyed in accordance with a normal practice in the face of a defense request to preserve the evidence (and there was no alternative means of obtaining the evidence). *Citing Columbus v. Forest*, 36 Ohio App.3d 169, 173, 522 N.E.2d 52 (1987). *But see State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 8 (refusing to engage in a discussion of this analysis, even though the appellate court adopted *Forest*). However, the stamp edges were consumed prior to indictment (and not after a defense request). Her argument is reliant on her tainted evidence claim presented next and rejected.

to the independent lab in the same delivery with evidence from another case, which she claims was deliberate or showed complete disregard for the evidence.

{¶32} We begin by noting the state did not destroy the evidentiary item from which touch DNA was collected (the envelope with an affixed stamp plus a torn flap); rather, the touch DNA on small portions of the item tested was consumed during analysis. In addition to the envelope (with its remaining adhesive portions), the card and drugs were available for defense testing.

{¶33} Contrary to Appellant's contention, the four edges of the stamp utilized by BCI were not materially exculpatory. Evidence is not material where it is argued it "could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57-58 (finding no due process violation where the state failed to properly preserve semen samples and clothes recovered from a child-victim and defense experts testified the defendant might have been exonerated by the timely testing of properly preserved samples). In fact, the stamp edges were already subjected to tests by a BCI scientist, who recovered a partial DNA profile consistent with Appellant's DNA. The results did not exonerate her. There was no reasonable probability these stamp edges would have changed the outcome or impeached the BCI scientist's testimony.

{¶34} We conclude the forensic scientist's act of cutting the four edges of a stamp for DNA testing and disposing of those edges after the DNA was consumed (by being soaked in detergent for extraction) did not equate with the withholding or destruction of materially exculpatory evidence. *See, e.g., Trombetta*, 467 U.S. 479, 488-489 (the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed" which was not satisfied where the breath sample showed intoxication). *See also State v. Rios*, 2d Dist. Clark No. 10CA0099, 2012-Ohio-3289 ("The consumptive testing of evidence violates a defendant's due process rights only when the evidence possesses an exculpatory value that was apparent before the evidence was destroyed").

{¶35} We next note the discarded edges were not themselves potentially useful post-testing because it was agreed retesting should not be performed on the pieces subjected to the extraction process. Appellant may be suggesting a non-tested edge could have been potentially useful (if left behind). There was no showing the small BCI sample utilized too much of the stamp for standard testing. Because a due process violation was not raised at trial, there was no notice of an incentive to delve further into

Case No. 21 BE 0042

the issue with additional expert testimony at trial. Nevertheless, the testimony indicated the procedure used was standard. In fact, the defense expert also cut *all four edges* from the stamp; she additionally cut and combined 18 pieces from the envelope flap. The BCI scientist explained the protocol was to dispose of the tested portion of the stamp, as it would not be suitable for retesting in the search for touch DNA. Again, the defense expert agreed it was expected that the initial testing would consume the portion tested and make it unusable again. Furthermore, she specifically said she had no criticism of BCI's technique.

{¶36} In any event, there is no indication the BCI scientist was acting with bad faith when she utilized the four edges of the stamp and disposed of them after extracting a DNA profile. In fact, Appellant's bad faith argument revolves around a different issue: the inclusion of an unrelated item in the package delivered to the defense expert.

{¶37} The tested items (minus the portions consumed in testing) were hand-delivered by a Belmont County Sheriff's Department captain to the laboratory retained by the defense. While listing the items in this package of evidence, the defense expert happened to mention the package also contained a second envelope seal from a different case. When she inquired about the item, she was told it was delivered in error. Contrary to Appellant's contention on appeal, there was no indication the inclusion of this item in the package tainted the requested items. In fact, the defense expert specifically said the additional item was labeled with a different case number. (Tr. 417). The defense expert did not suggest her results were affected by the presence of the item; nor did her testimony imply this unrelated item was unbagged or physically touching bare evidence to be tested. Appellant's arguments are speculative. This assignment of error is without merit.

{¶38} We also point out a due process claim was not made below; there was no attempt to exclude the DNA evidence or dismiss the case based on these alleged due process violations, even though Appellant now relies on pretrial conduct which was discussed in the trial testimony. *See, e.g., State v. Hamilton*, 1st Dist. Hamilton Nos. C-200041, C-200042, 2021-Ohio-1421, ¶ 12 (failure to raise a due process claim under *Youngblood* at trial level waived all but plain error). *See also Youngblood*, 488 U.S. at 58 (requiring the defendant to show a bad faith failure to preserve potentially useful evidence). The discretion to recognize plain error (where an obvious error is outcome-

determinative) must be exercised with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). *See also State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22 (the reasonable probability test for plain error's prejudice evaluation is the same standard for reviewing ineffective assistance of counsel claims). Appellant recognizes the failure to raise the issue in the next assignment of error on ineffective assistance of counsel, which also entails a reasonable probability test. In any event, as analyzed supra, there was no error, plain or otherwise.

ASSIGNMENT OF ERROR FOUR:  EFFECTIVENESS OF COUNSEL

**{¶39}** Appellant's final assignment of error generally states:

"INEFFECTIVE ASSISTANCE OF COUNSEL."

**{¶40}** A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If the performance was not deficient, then there is no need to review for prejudice and vice versa. *See State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶41}** In evaluating an alleged deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Our review is highly deferential to counsel's decisions as there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Id.* at 142-143, (there are "countless ways to provide effective assistance in any given case"), citing *Strickland*, 466 U.S. at 689. A reviewing court should not second-guess the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

**{¶42}** As to the prejudice prong, the court must find there is a reasonable probability the result of the proceedings would have been different but for counsel's serious error. *Id.* at 558. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the

outcome of the proceeding." *Bradley*, 42 Ohio St.3d at 142, fn. 1, quoting *Strickland*, 466 U.S. at 693.

{¶43} Appellant contends defense counsel was ineffective for failing to move to exclude the DNA evidence. She relies on the arguments set forth in the prior assignment of error, complaining she could not independently test the edges of the stamp that BCI tested and claiming the state tainted the DNA evidence sent to the independent lab by including evidence from another case in the delivery related to this case. As we found no validity to these contentions in the prior assignment of error, we likewise conclude counsel did not render deficient performance in failing to move to exclude the DNA evidence and there is no reasonable probability the outcome would have been different had counsel objected. *See State v. Henderson*, 39 Ohio St.3d 24, 33, 528 N.E.2d 1237 (1988).

{¶44} Lastly, Appellant argues defense counsel was ineffective by failing to challenge an unnamed juror she believes was biased against her. She claims she told her attorney one of the jurors worked at the high school she and her husband attended. Her brief also states this juror disciplined her husband multiple times.

{¶45} Notably, Appellant's brief does not identify the juror being discussed in her argument. Due to this failure, we cannot evaluate the answers provided during jury selection, and we cannot confirm the complained of prospective juror ended up sitting on the jury. As the state points out, the original panel of prospective jurors was asked if they knew Appellant, and they said they did not. (Tr. 13). After some challenges by both sides, the replacement venire members who ended up on the jury were also asked this question. (Tr. 134-135, 146. 164).

{¶46} Regardless, the facts claimed in this section are not part of the record before this court. At trial, there was no discussion of the background facts regarding the juror's knowledge of Appellant or regarding the school Appellant and her husband attended, and the alleged disclosures to counsel are not in the record. "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. Rather, the appellate court is limited to what transpired as reflected by the record on direct appeal. *Id.* at 406. Specifically, if a claim of ineffective assistance of counsel requires proof from outside of

the record, then such claim is not an appropriate topic in the direct appeal. *State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001).

{¶47} We lastly note jury selection is a standard part of trial strategy. *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63 (declining to "second-guess trial strategy decisions" or employ "hindsight views about how current counsel might have voir dired the jury differently"). If there was a discussion between counsel and Appellant during voir dire, they may have strategically decided it was better to leave a potentially sympathetic former acquaintance on the jury than to take a chance with another juror. In such event, one cannot rely on hindsight to remedy a trial tactic of deciding not to use the last peremptory challenge on this individual when it may have been determined that the challenge could be better exercised against a more concerning prospective juror. (Tr. 163). This assignment of error is overruled.

{¶48} For the foregoing reasons, Appellant's conviction is affirmed.


Donofrio, P J., concurs.

D'Apolito, J., concurs.

[Cite as *State v. Murphy*, 2022-Ohio-4555.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**